## CREEKMORE v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. October 17, 1916.)

### No. 4591.

1. CONTEMPT ⬩⇒54(3)—CRIMINAL CONTEMPT—INFORMATION—VERIFICATION.

An information for a constructive criminal contempt, filed by a district attorney and praying that the defendant, etc., is not insufficient because verified on information and belief.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. § 145; Dec. Dig. ⬩⇒54(3).]

2. CONTEMPT ⬩⇒54(2)—CRIMINAL CONTEMPT—INFORMATION.

Under Judicial Code (Act March 3, 1911, c. 231) § 268, 36 Stat. 1163 (Comp. St. 1913, § 1245), which provides that the federal courts "shall have power * * * to punish by fine or imprisonment, at the discretion of the court, contempts of their authority," it is not necessary that an information for criminal contempt should pray for any specific punishment.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. § 144; Dec. Dig. ⬩⇒54(2).]

3. CONTEMPT ⬩⇒72—CRIMINAL CONTEMPT—PUNISHMENT—FEDERAL COURTS.

Under such statutes, where imprisonment is imposed as a punishment for contempt, the length of term and place of confinement are within the discretion of the court.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 249–256, 273; Dec. Dig. ⬩⇒72.]

4. CONTEMPT ⬩⇒72—CRIMINAL CONTEMPT—NATURE OF OFFENSE.

With certain exceptions, a criminal contempt is a crime, and a criminal contempt proceeding is a criminal proceeding for all purposes, and one adjudged guilty of a criminal contempt may be properly characterized as a convict.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 249–256, 273; Dec. Dig. ⬩⇒72.]

5. CONTEMPT ⬩⇒72—CRIMINAL CONTEMPT—PUNISHMENT—"OFFENSE."

A criminal contempt is an "offense," within the meaning of Rev. St. § 5541 (Comp. St. 1913, § 10527), and, where the sentence imposed exceeds a year imprisonment, may be in a penitentiary.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 249–256, 273; Dec. Dig. ⬩⇒72.

For other definitions, see Words and Phrases, First and Second Series, Offense.]

In Error to the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

---

⬩⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

. Proceeding for criminal contempt against William J. Creekmore. Conviction and sentence, and defendant brings error. Affirmed.

James C. Denton, of Muskogee, Okl., and Norman R. Haskell, of Oklahoma City, Okl. (Frank Lee, of Muskogee, Okl., and E. G. McAdams, of Oklahoma City, Okl., on the brief), for plaintiff in error.

Paul Pinson and W. P. McGinnis, Sp. Asst. U. S. Attys., of Muskogee, Okl. (D. H. Linebaugh, U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. The plaintiff in error was adjudged guilty of contempt by the District Court and sentenced to be confined a year and a day in the Leavenworth Penitentiary, and he sued out a writ of error in this case. He will be hereafter styled the defendant.

The information for contempt was against William J. Creekmore, Ben Green, J. O. Ammerman, W. B. Robinson, and J. D. Lane. The petition or information for contempt particularly and specifically charged in detail the facts constituting the alleged contempt, of which the defendant was subsequently adjudged guilty. It was verified by the United States attorney for the district to the effect that the facts stated were true and correct upon information and belief. There was no warrant of arrest issued, but the court ordered that the charge be investigated by the court, and issued a rule to the defendants to show cause. The defendant Creekmore appeared, and without waiting for the investigation ordered demurred to the petition and affidavit, because the latter was made upon information and belief. This was overruled. He then made an oral motion to quash the petition and affidavit on the same ground, which was likewise overruled. He objected to the introduction of any evidence upon the same ground, and this was also overruled, and to each of these rulings he at the time excepted.

[1] In Merchants' Stock & Grain Co. v. Board of Trade of Chicago, 201 Fed. 20, 120 C. C. A. 582, we somewhat extensively considered the numerous points on which it has been held that criminal contempt cases are not crimes under the Fifth Amendment, and are not criminal proceedings under the Sixth Amendment, to the federal Constitution. It will not be necessary for us to review the decision in that case. In England, in cases of this kind, the charge could be made by the King in his courts, without any evidence and against all evidence. It is true the Fourth Amendment to the federal Constitution provides that no warrant shall issue, but upon probable cause supported by oath or affirmation. Conceding for the purposes of this case, and for it alone, that the Fourth Amendment applies to contempt cases, there never was any warrant issued, but simply a rule to show cause until after the taking of all the testimony, which was an ample compliance with the provision of the Fourth Amendment. The court specially found:

"The defendant Creekmore sought to influence the juror Seymour in his action, conduct, and vote as a juror in said cause in his (Creekmore's) favor,

and that this conduct on the part of defendant Creekmore amounts to misbehavior, if not in the very presence of the court, so near thereto as to obstruct the administration of justice."

It is therefore gravely doubtful whether the court found that this was anything but a direct contempt. Let us assume, however, as most favorable to the contention of the defendant Creekmore, that, if the defendant was guilty at all, it was of a constructive contempt, rather than a direct one. It is said:

"Although statements or affidavits made on information and belief have been held sufficient, the better practice requires the material allegations to be made of personal knowledge." 9 Cyc. 39.

And again:

"While an instance is given where an accusation was deemed sufficient, though only on information and belief, it is a rule in most jurisdictions that such an affidavit is wholly insufficient upon which to base constructive contempt proceedings, and that no jurisdiction can be acquired by the court thereunder." 6 Ruling Case Law, 532.

In support of the first of these propositions Cyc. cites, in the original note and the subsequent ones, In re Acock, 84 Cal. 50, 23 Pac. 1029; Jordan v. Wapello County Circuit Court, 69 Iowa, 177, 28 N. W. 548; Hughes v. Territory, 10 Ariz. 119, 85 Pac. 1058, 6 L. R. A. (N. S.) 572; State v. District Court, 37 Mont. 590, 97 Pac. 1032. To the same effect, as applied to an information by a public prosecutor, is Emery v. State, 78 Neb. 547, 111 N. W. 374, 9 L. R. A. (N. S.) 1124.

It thus appears that California, Iowa, Nebraska, Montana, and Arizona are all committed to the theory of the sufficiency of the information in this case. It will appear that substantially all of these decisions upon this subject have been decisions in the state courts. Many of them have been governed by state statutes. Many state laws provide that the affidavits shall be evidence, and of course they cannot perform that office, if made upon information and belief; but we will now proceed to consider the cases cited in Cyc. and Ruling Case Law to sustain the converse of the last proposition considered.

The first case cited is In re Wood, 82 Mich. 75, 45 N. W. 1113. This case does not at all sustain the text. It did not involve a question as to the effect of an affidavit upon information and belief, for in that case there was no affidavit filed at all, and one was explicitly held to be necessary under two sections of the Michigan statutes. The same is true of Russell v. Mandell, Circuit Judge, 136 Mich. 624, 99 N. W. 864.

In Ludden v. State, 31 Neb. 429, 48 N. W. 61, the text is sustained, where the affidavit was filed by one not a public prosecutor; and the same is true of Herdman v. State, 54 Neb. 626, 74 N. W. 1097. The same is true of Belangee v. State, 97 Neb. 184, 149 N. W. 415, but in the last case three judges out of seven dissented, and, as already indicated, it was held by a unanimous court in Emery v. State, 78 Neb. 547, 111 N. W. 374, 9 L. R. A. (N. S.) 1124, that, where the charge of contempt of court is set forth in an information in positive and direct terms, the statement by the public prosecutor in his verification

thereto "that the allegations and charges in the within information are true, as he verily believes," does not render such information void.

The case of State v. Conn, 37 Or. 596, 62 Pac. 289, did not involve the question now under consideration at all, but was a question of the construction of the Oregon statute.

In State v. Newton, 16 N. D. 151, 112 N. W. 52, 14 Ann. Cas. 1039, by a vote of two to one the Supreme Court of that state sustained the text. In State v. Heiser, 20 N. D. 357, 127 N. W. 72, the court distinguished the case of State v. Newton.

The case of Freeman v. City of Huron, 8 S. D. 435, 66 N. W. 928, measurably sustains the text, the court saying:

"Persons should not be required to answer an essentially criminal charge based merely upon the belief of a *private* prosecutor."

In Ex parte Landry, 65 Tex. Cr. R. 440, 144 S. W. 962, in the Texas Court of Criminal Appeals, in the opinion may be found an expression that the affidavit should be positive, and not on information and belief. This was clearly dictum, as there was no affidavit at all filed in that case.

In Davidson v. Munsey, 29 Utah, 181, 186, 80 Pac. 743, 744, the court expressly refused to pass upon the question, saying:

"Therefore the question as to whether the affidavit made by Davidson upon information and belief was sufficient to give the court authority to act in the matter becomes unimportant."

The only two Federal cases cited are In re Judson, 3 Blatchf. 148, Fed. Cas. No. 7,563, and Parkhurst v. Kinsman, 2 Blatchf. 76, Fed. Cas. No. 10,759. Neither of these cases tends in any degree to support the text.

The plaintiff in error cites, as to the same effect, Snyder v. State, 151 Ind. 553, 52 N. E. 152; Early v. People, 117 Ill. App. 608; State v. Root, 5 N. D. 487, 67 N. W. 590, 57 Am. St. Rep. 568; In re Nickell, 47 Kan. 734, 28 Pac. 1076, 27 Am. St. Rep. 315; In re McKenna, 47 Kan. 738, 28 Pac. 1078; Thomas v. People, 14 Colo. 254, 23 Pac. 326, 9 L. R. A. 569; State v. Nathans, 49 S. C. 199, 27 S. E. 52, 57. None of said cases tend in any manner to sustain the proposition that informations charging criminal contempt must be verified, not upon information and belief, but absolutely.

It thus appears that, while the statement in Cyc. that "the better practice requires the material allegations to be made of personal knowledge" may be true, it is only sustained by North and South Dakota, and possibly Texas and Nebraska, though Nebraska has squarely held that where the information is filed by the public prosecutor the form used in this case is sufficient.

The statement in Ruling Case Law that "it is a rule in most jurisdictions that such an affidavit is wholly insufficient upon which to base constructive contempt proceedings, and that no jurisdiction can be acquired by the court thereunder," is not sustained either by the authorities cited or by any that have been called to our attention.

There are no federal statutes on the procedure in contempt cases, except, in relation to the Court of Claims (Judicial Code, § 157 [Comp.

CREEKMORE V. UNITED STATES 747

St. 1913, § 1148]) that "it may punish for contempt in the manner prescribed by the common law." All other contempt cases in the federal courts are under section 268 of the Judicial Code and its predecessors. The people in this country succeeded to the sovereignty of the king, and it would perhaps be difficult to make clear, where no warrant is sought for the arrest of the defendant until after trial, why any different rule should, in the absence of statute, prevail from that which prevailed in England. See the very interesting and able opinion by Rogers, Circuit Judge, in Weeks v. United States, 132 C. C. A. 436, 216 Fed. 292, L. R. A. 1915B, 651.

Assuming, however, the necessity of an affidavit, or information supported by affidavit, as the basis of the proceeding, even if filed by a private prosecutor, there seems no ground to hold, in the absence of a statute, that a verification of the information upon information and belief is not sufficient. It is not our purpose to discuss these questions, interesting as they may be when they arise.

The only American case that we have been able to find on the very question here before us, namely, how must an information by a public prosecutor be verified, is Emery v. State, 78 Neb. 547, 111 N. W. 374, 9 L. R. A. (N. S.) 1124. The defendant was charged with influencing a juror in a criminal case in which he was a party by agreeing to pay and subsequently paying him cash. Manifestly the public prosecutor would have no personal knowledge of the truth of such a charge. It is doubtful if he could accumulate affidavits that would positively state the facts showing such guilt. Many states have laws providing for compulsory affidavits, but our attention has not been called to any such federal statute. To say that voluntary affidavits must be obtained before the public prosecutor can start such proceedings is to say that one of the most heinous offenses known to the law, that of "jury fixing," shall go wholly unpunished. Confronted by such a danger, we have no hesitancy in holding that the public prosecutor can file an information for contempt, positive and specific in its charges, and verify it upon information and belief, and, while such information may not justify the issuance of a warrant of arrest, it is not void, and where a rule is issued upon such information that defendant show cause, and upon the hearing, upon the testimony of sworn witnesses, the evidence shows the defendant guilty, he may be so adjudged, and that a warrant of arrest issued upon the conclusion of the case is upon "oath or affirmation," as provided in the Fourth Amendment to the Constitution. See Sona v. Aluminum Castings Co., 214 Fed. 936, 131 C. C. A. 232.

[2] The prayer to the information is that the defendants be required "to show cause, if any they have, why they or either of them should not be punished as for contempt of this court for and on account of the matters and things as above set forth." The case made in the information was clearly one of criminal contempt. One of the chief functions of a prayer in such informations is to show whether it is sought to convict the defendant of a civil or criminal contempt, but it was wholly unnecessary for that purpose here. Section 268 of the Judicial Code provides:

"The said courts shall have power  *  *  *  to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority."

With the statute thus vesting almost unlimited discretion in the court as to the character and extent of punishment, no benefit would be derived from requiring the prosecutor to specially pray for a given kind of punishment; or attempt to limit the degree of such punishment. The prayer was sufficient under all the circumstances of this case.

The defendant next contends the information was duplicitous, and the court erred for that reason in overruling the demurrer and in overruling a motion to require the government to elect. It has been said:

"The court will never be keen to hold an indictment bad for duplicity." 5 Ruling Case Law, 1031.

The same with at least equal certainty may be said of an information for contempt.

Subsequently the court sustained the motion of the defendant, made at the close of the government's case, to strike all the evidence bearing on other contempts than the bribery of the juror Seymour, and on final hearing adjudged this defendant not guilty of all the specifications of contempt, save upon that particular charge. This was in all respects equivalent to sustaining his motion to require the government to elect, and if it should be conceded that the information was duplicitous, and we only concede it for the purposes of this question in this case, and the demurrer and motion to require an election should have been sustained, there was no prejudice.

We shall now turn to the evidence, as the other questions will be better understood and more readily disposed of with the facts in mind.

An indictment was returned in the District Court of the United States for the Eastern District of Oklahoma against the defendant Creekmore and 27 others, charging them with having conspired to violate the law of the United States prohibiting the introduction of intoxicating liquors from without the state into what was formerly Indian Territory. Act March 1, 1895, c. 145, 28 Stat. 693. This case was numbered 1507. Moses E. Miller, one of the defendants, secured a continuance; but that case, as against this defendant and others, was set down for trial at Muskogee on February 8, 1915. That case was, of course, triable to a jury, and the jury was ordered kept together in the charge of two bailiffs from the time it was impaneled until it was finally discharged. During this period, however, Mr. John H. Seymour was permitted night and morning to call his wife up by telephone from the hotel where the jury were stopping primarily at least to inquire as to the condition of their baby. At and for some time prior to the time of that trial Mr. Creekmore lived at Joplin, Mo., which was 130 miles northeast of Muskogee upon the line of the Missouri, Oklahoma & Gulf Railroad. Between the two, and some 39 miles from Muskogee on the same railroad, was Locust Grove. It inferentially appears from the evidence that at one time Mr. Creekmore lived in Oklahoma, that his wife's people lived at Locust Grove,

and Peter Bagby also at one time. lived at Locust Grove and was a friend of Creekmore. Just where Creekmore lived, aside from this, would be purely a matter of speculation. E. H. Braley and his wife, Mrs. E. H. Braley, lived at 716 Capitol Place, in Muskogee. Mrs. Braley was not acquainted with Mr. Creekmore, and probably not acquainted with Mr. Creekmore's wife, Mrs. Creekmore, until Mr. Peter Bagby obtained, in December, 1914, an invitation to the two daughters of the Braleys, one married and the other single, to spend the week-end of Christmas week as the guests of the Creekmores. During this visit Peter Bagby gave a list of the regular panel of trial jurors at the January term, 1915, to one of the daughters of the Braleys, and told her to give it to her father. Mr. Creekmore, on a visit to Muskogee, also gave Mr. Braley a list of those jurors. During this visit the Braley girls invited Mr. and Mrs. Creekmore to come to their home at the time of the trial of the case 1507, and they did so. They remained at the Braley house about five days, when Mrs. Creekmore was called away, probably on Friday, by the illness of her mother, and it was then arranged that Mrs. Braley would go up to Joplin and take some things that Mrs. Creekmore had bought at an auction at Muskogee. Mrs. Braley first met Mr. Creekmore when he thus came to her house the first day of the trial. About the second day of the trial Mr. Creekmore and Mr. Braley came into the Braley diningroom, and Mr. Creekmore said, "One of your good friends is on my jury," and Mrs. Braley said, "Who is it?" and Mr. Creekmore said, "What's his name?" and Mr. Braley said, "John Seymour.". On the first day of the trial Mrs. Creekmore and Mrs. Braley went down to the auction at one Miesch's jewelry store. They there met a Mrs. Blodgett, who inquired of Mrs. Creekmore what she was doing there, and Mrs. Creekmore said, "Don't you know that Creekmore is having his trial?" She expressed her worry over the matter, and Mrs. Blodgett said to Mrs. Braley, "Mr. Seymour is on that jury, why can't you do something?" About noon one day Mr. Creekmore suggested that his wife and Mrs. Braley go up to the courtroom together, so that John Seymour would see them in company. In the afternoon of the first day of the trial Mrs. Braley and Mrs. Creekmore met Mrs. Seymour on the street with another lady. Mrs. Braley introduced Mrs. Creekmore to Mrs. Seymour. Mrs. Braley said to Mrs Seymour, "I want to speak to you a minute," and they stepped to the edge of the sidewalk, and Mrs. Braley said to Mrs. Seymour, "I would give $500 to whisper in your husband's ear." Mrs. Seymour said, "I will do it for a whole lot less." Mrs. Braley said, "Do you talk to him?" and Mrs. Seymour said, "I talk to him every evening; what do you want me to tell him?" Mrs. Braley said, "Tell him that Creekmore is a friend of ours, and to stick with the Creekmore interests, and you can have anything you want." Mrs. Braley testified they left Mrs Seymour, and she immediately told Mrs. Creekmore and said, "I might have to spend some money for you on that," and Mrs. Creekmore said, "That was all right, you go ahead, and Mr. Creek he will back any financial obligations that you have to make." Mrs. Braley and Mrs. Creekmore arranged to call on Mrs. Seymour after she had conferred with her

husband, but that evening Mrs. Creekmore got a telephone call from her father at Locust Grove, and while she was waiting for the connection she could not leave, and Mrs. Braley and her husband went down to see Mrs. Seymour, who was to talk with her husband at 7:30 and tell Mrs. Braley what he had to say. After their return Mrs. Braley told Mrs. Creekmore what Mrs. Seymour had told her. That night Mr. Creekmore and Mrs. Creekmore both occupied the same room in the Braley house as they did every night while they were there. After Mrs. Creekmore was called away from the Braley house, or probably on Friday night, Mrs. Seymour telephoned to Mrs. Braley that everything was going all right. Mr. Creekmore called up the Braley house about an overcoat he had lost, and Mrs. Braley said, "I have got some good news for you," and he wanted to know what it was, and she told him that she could not tell him over the phone, to come out, and he came out in a taxicab, and Mrs. Braley then told him that Mrs. Seymour said everything was all right. Thereupon Mr. Creekmore simply shrugged his shoulders and laughed as though he were highly pleased over the way things were going. About one or two weeks after the trial, some one, who gave his name as Creekmore, invited Mrs. Braley by phone to come for a visit to Joplin and to bring Mrs. Seymour with her; that he wanted to make Mrs. Seymour a present. Mr. Braley testified that he was at the Seymours with his wife, and that he was out of town the most of the week, and returned the last day of the trial. This was after Mrs. Creekmore had been called away by her mother's illness, and Mr. Creekmore had left the Braley home, and Mr. Creekmore phoned to Mr. Braley at his house to come down to his lawyer's office, as he wanted to see him there, and Mr. Braley went down, and Mr. Creekmore told him he would like for Mrs. Braley and Mrs. Seymour to come up to Joplin, as he wanted to make Mrs. Seymour a present; that she had been very nice to him during the trial. About two weeks after this time Mr. Creekmore called Mr. Braley up by long-distance telephone, and said, "This is Creek," and that he and his wife had been out of town, and they wanted to be at home when Mrs. Braley and Mrs. Seymour came up. Mr. Braley told him that Mr. Seymour said he did not think Mrs. Seymour could go. Mr. Creekmore said he wanted to make Mrs. Seymour a present, and Mr. Braley said, "What do you want to give her?" and Mr. Creekmore said, "$200;" and Mr. Braley said, "All right, how do you want to give it to her?" Mr. Creekmore said, "Well, I will send you a check;" but Mr. Braley said, "No, give that to me when I am at Joplin again some time;" and that was the end of that conversation. About two weeks after that Mr. and Mrs. Braley were going down the street one afternoon and met Mrs. Seymour, and Mrs. Braley said to Mr. Braley, "She did not speak to me, and I feel like Mrs. Seymour is expecting something, and I think that we have done her wrong;" and Mr. Braley said, "Well, if she feels that way, I would rather pay it out of my own pocket, if I never get it back." Mr. Braley then, on March 15th, gave his personal check to Mrs. Braley for $200. It appears that Mrs. Braley cashed this and took $150 in currency into the store where Mr. Seymour was working

and handed it to him.  About two or three weeks later Mr. Braley received a long-distance call, and the party said, "This is Creek" (which was a name frequently applied to Creekmore), and the person talking said he was going to be away again, and wanted to know what had been done about the Seymour Case, and Mr. Braley said, "I have paid it;" and the party talking said, "I will send you a check down." About April 7th Mr. Braley received a draft drawn by the First National Bank of Tulsa on the Southwest National Bank of Commerce of Kansas City payable to Mr. Braley.  It was received by mail and was unaccompanied by any letter.  Mr. Braley states that no one else owed him just $200 except Mr. Creekmore, and the money was accepted in payment of the amount he had advanced to his wife.

The records of the bank at Tulsa show that this draft was issued for Moses E. Miller, who was one of the defendants in the case 1507; but the case was continued as to him on account of his illness, of which he subsequently died, and he was not at Tulsa when this draft was drawn, and was unable to transact any business at that time.  Mr. and Mrs. Seymour were both witnesses, and in all substantial respects testified to the same state of facts as the Braleys, so far as the facts were within their knowledge.  Mrs. Seymour testified that after her first talk with Mrs. Braley, and in her talk that evening with Mr. Seymour, she told him that she had been approached, and he told her to keep still, to be very careful about what she said; that later that night the Braleys came to her house, and Mrs. Braley told her, "You just tell him for us that we have been here, and it will be worth his while if he will hang the jury;" that Mrs. Braley insisted, and Mrs. Seymour was talked into it, and she spoke to her husband the next morning, and he said, "Nothing doing," that one day her husband came home and gave her $150, said Mrs. Braley came into the store and handed him this bundle of money, and she deposited it to her credit in the First National Bank of Muskogee.  Mr. Seymour testified that at the time he was manager of the Varsity Clothes Shop.  He testified that his wife telephoned him that their friends on Capitol Hill had suggested to her that she say to him that they would make it worth his while if he would hang the jury in the Creekmore case; that he told her to keep still, and the next morning she advised him that their friends had been to their home, and had talked to her as they had in the afternoon, and that they would make it worth his while to vote for acquittal or hang the Creekmore jury; that he then told her there was nothing doing; that subsequently, when he was in the store where he was employed, Mrs. Braley came into the store to make some purchases, actually or ostensibly, and she handed him a roll of money containing $150 without any remarks whatever; that the next morning, March 16th, he deposited the money in his wife's name; that Mrs. Braley did not owe him anything at the time she made this payment, and no one else owed him that sum.  The Braleys and the Seymours had never exchanged calls prior to this event, but Mr. Braley was a customer of the Varsity Store.

From the evidence, of which we have given but a brief synopsis, we think it was shown beyond all reasonable doubt that a success-

ful effort was made to corrupt the juror Seymour; that this was well known to Mrs. Creekmore, and that her husband must, by his whole course of conduct, have been deemed to have knowledge of it; that he was informed by Mrs. Braley that things were going all right with Seymour before the trial ended; that he sent for Mr. Braley for the sole purpose of arranging to have Mrs. Seymour go up to Joplin, that he might there make her a present; that the invitation was extended indirectly to Mrs. Seymour to go to Joplin for that purpose; that he subsequently decided that $200 was the amount he wanted to pay her; that twice or three times he called up the Braleys 130 miles away by telephone; that finally, when Braley had paid the money, he promised to send a check for it; that the draft for $200, which was sent from Tulsa, was sent by him; that this was a gross contempt of court, and one which, if tolerated, would bring more of disgrace upon it than was brought upon the English courts by the corruption of Lord Bacon.

Numerous objections were made and overruled to the evidence to which we have referred, and a demurrer was filed to the evidence at the close of all of it but none of them were in our judgment well taken.

Error is assigned upon the findings of the court, but we think they were well sustained by the evidence.

[3] It is insisted that the court exceeded its power in sentencing the defendant to imprisonment in the penitentiary for the term of a year and a day. We have seen that the Judicial Code authorized the federal courts to punish by fine or imprisonment, at the discretion of the court, for contempt of their authority. There is nothing in the statute which limits where the imprisonment shall take place, except the discretion of the court. While it is true that this statute limited the power to punish for contempt, it is either declaratory of the common law or broadened it as to punishment in contempt cases. It expressly declared that the length of imprisonment and its place should be in the discretion of the court.

This court having in Merchants' Stock & Grain Co. v. Board of Trade of Chicago, 201 Fed. 20, 120 C. C. A. 582, with some elaboration set forth some seven or eight matters in which the authorities settle that a criminal contempt proceeding is not a criminal case or a criminal proceeding, it now becomes necessary to turn to the question as to in what respects such a criminal contempt proceeding may be said to be a criminal case or a criminal proceeding.

In Durant v. Washington County, 1 Woolw. 377, 8 Fed. Cas. No. 128, Mr. Justice Miller, delivering the opinion for the District Court of the United States for the District of Iowa, said:

"We are satisfied, however, upon consideration, that a prosecution for contempt of court is a criminal proceeding, in which the government is interested as plaintiff, and that, whenever it becomes necessary for the government's attorney to appear to vindicate its authority as represented in the courts, it is his duty to do so."

In Gompers v. United States, 233 U. S. 604, 610, 34 Sup. Ct. 693, 695 (58 L. Ed. 1115, Ann. Cas. 1915D, 1044), the court, by Mr. Justice Holmes, said:

"It is urged in the first place that contempts cannot be crimes, because, although punishable by imprisonment and therefore; if crimes, infamous, they are not within the protection of the Constitution and the amendments giving a right to trial by jury, etc., to persons charged with such crimes. But the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital, not formal; it is to be gathered, not simply by taking the words and a dictionary, but by considering their origin and the line of their growth. Robertson v. Baldwin, 165 U. S. 275, 281, 282 [17 Sup. Ct. 326, 41 L. Ed. 715.] It does not follow that contempts of the class under consideration are not crimes, or rather, in the language of the statute, offenses, because trial by jury, as it has been gradually worked out and fought out, has been thought not to extend to them as a matter of constitutional right. These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes, as that word has been understood in English speech. So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure (3 Transactions of the Royal Historical Society [N. S.] p. 147 [1885]), and that at least in England it seems that they still may be and preferably are tried in that way. See 7 Halsbury, Laws of England, 280, sub. v. Contempt of Court (604); Clements v. Erlanger, 46 L. J. (N. S.) 375, 383; Matter of Macleod, 6 Jur. 461; Schreiber v. Lateward, 2 Dick. 592; Wellesley's Case, 2 Russ. & M. 639, 667; In re Pollard, L. R. 2 P. C. 106, 120; Ex parte Kearney, 7 Wheat. 38, 43 [5 L. Ed. 391]; Bessette v. W. B. Conkey Co., 194 U. S. 324, 328, 331, 332 [25 Sup. Ct. 793, 49 L. Ed. 630]; Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 441 [31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874]."

In that case the court held that the statute of limitations with reference to ordinary crimes (Revised Statutes, § 1044 [Comp. St. 1913, § 1708]):

"No person shall be prosecuted, tried or punished for any offense not capital * * * unless the indictment is found or the information is instituted within three years next after such offenses shall have been committed"

—applies to criminal contempt cases.

[4] With the exceptions noted in our opinion in Merchants' Stock & Grain Co. v. Board of Trade of Chicago, supra, and perhaps some others, a criminal contempt is a crime, and a criminal contempt proceeding is a criminal proceeding, for all purposes, and one adjudged guilty of a criminal contempt may be properly characterized as a convict. Webster's New International Dictionary defines "convict" as:

"A person proved guilty by a competent tribunal, of a criminal offense; esp., a person convicted of and under sentence for a felony or a serious crime."

There is no doubt that the defendant has been "proved guilty of a criminal offense," and, if we turn to the more restricted definition, the bribery of a juror is a "serious crime." It is provided in section 335 of the Criminal Code that:

"All offenses which may be punished by death, or imprisonment for a term exceeding one year, shall be deemed felonies. All other offenses shall be deemed misdemeanors." Act March 4, 1909, c. 321 (35 Stat. 1152 [Comp. St. 1913, § 10509]).

Assuming that criminal contempts are offenses in the meaning of this statute, as they are in the holding of the Supreme Court in

237 F.—48

the Gompers Case, supra, under Revised Statutes, § 1044, we must either assume that a defendant may be sentenced to prison for more than a year or that a statute which provides that the defendant may be punished by imprisonment at the discretion of the court in some mysterious way means that the discretion is limited to one year, without that thought being expressed. It will be observed that section 335, in defining felonies, said nothing about penitentiaries. It is the length of possible imprisonment that fixes whether the offense is a felony or a misdemeanor. It must be borne in mind that, while nearly all of the states have both penitentiaries and jails, the United States has no prisons except its penitentiaries, save as it has the use of state institutions. We see no reason why, under Judicial Code, § 268, the court could not sentence a guilty party for a year and a day, and, if it had this power, then section 335 of the Criminal Code made it a felony. With this conclusion, substantially the entire argument against his sentence to the penitentiary falls to the ground.

[5] It seems to be conceded that if the court could sentence a defendant in a criminal contempt case for more than a year, and if his guilt was an offense under Rev. St. § 5541, then under that section as amended he could be sentenced to the penitentiary. The Supreme Court has held that a criminal contempt is an offense under R. S. § 1044, and we see no reason for holding that it is not an "offense" under Criminal Code, § 335, and under R. S. § 5541. In Re Savin, 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150, for an unaccepted offer to bribe a witness Savin was sentenced to a year in jail, and the judgment was affirmed.

The question therefore at once arises: Is an order that a defendant in a criminal contempt case be imprisoned a year within the "discretion of the court" but a sentence for a year and a day beyond it? We have neither seen nor heard any argument which so convinces us, and if a sentence of a year and a day is within the discretion of the court, we find that it is an offense within section 5541 and the various amendments thereof, and the sentence could and must be in the penitentiary. Even under state laws many persons are confined in the penitentiary for safe-keeping and the like who have never been convicted of any offense and may never be.

Under the act on contempt the defendant might be sentenced according to the period of the sentence to imprisonment in the custody of the marshal, or in jail, or in the penitentiary. Substantially none but state court decisions are cited to the contrary, and of course they are not binding upon the federal courts. Notable among the cases thus cited are Rogers Manufacturing Co. v. Rogers, 38 Conn. 121, 123, a contempt case; Cheaney v. State, 36 Ark. 74; State v. McNeill, 75 N. C. 15; Horner v. State, 1 Or. 267; Brooks v. People, 14 Colo. 413, 24 Pac. 553, and Ex parte Cain, 20 Okl. 125, 93 Pac. 974, misdemeanors. Nor are we oblivious of the fact that the Supreme Court of Iowa rendered a somewhat similar decision in Flannagan v. Jepson, Judge, 158 N. W. 641, in a contempt case.

While we could, if we saw fit, point out many reasons why these cases are either unsound or inapplicable, suffice it to say that they

do not attempt to pass upon the question of the power of a federal court to sentence to the penitentiary for contempt.

The defendant has argued that, if a contempt be a felony and the defendant a convict, the provisions of the various amendments to the Constitution of the United States will protect him against a summary trial; but we have already pointed out in Merchants' Stock & Grain Co. v. Board of Trade of Chicago, supra, that this is not true. If there seems to be any conflict between declaring a criminal contempt a felony and then declaring that the defendant is not entitled to the protection of the amendments to the Constitution, the explanation is to be found in the announcement first made by Chief Justice Fuller in O'Neal v. United States, 190 U. S. 36, 23 Sup. Ct. 776, 47 L. Ed. 945, and repeated in Bessette v. Conkey Co., 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997, that "proceedings in contempt may be said to be sui generis." In passing, attention may be called to the fact that in this case of O'Neal v. United States, supra, it was held that contempt cases were criminal cases within the law with reference to writs of error.

A most careful and elaborate argument has been filed for the purpose of establishing that Act March 1, 1895, 28 Stat. 693, was repealed in toto by the admission of Oklahoma into the Union, and there being no crime known to the law, such as the defendant and others were indicted for, the court had no jurisdiction, and therefore it was not a contempt of court to influence one of the jurors in that case. While this argument is very interesting, it cannot be accepted by us. The Supreme Court has at least three times held the statute in question was not repealed, except in part, by the admission of Oklahoma. Ex parte Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248; United States v. Wright, 229 U. S. 226, 33 Sup. Ct. 630, 57 L. Ed. 1160; Joplin Mercantile Co. v. United States, 236 U. S. 531, 35 Sup. Ct. 291, 59 L. Ed. 705. And until the Supreme Court shall modify that holding, if ever, its decisions are conclusive upon·us.

If we have failed to note in this opinion any of the points raised in the 350 printed pages of brief and argument, it is not because they have not been considered, as they have been gone over with all the care possible.

The judgment of the District Court is affirmed.