### UNITED STATES ex rel. ACCARDI v. SHAUGHNESSY.

No. 287, Docket 22750.

United States Court of Appeals
Second Circuit.

Argued June 2, 1953.

Decided Aug. 11, 1953.

898

Jack Wasserman, Washington, D. C., for appellant; Irving Radar, New York City, of counsel.

J. Edward Lumbard, Jr., U. S. Atty., New York City, for appellee; William J. Sexton, Asst. U. S. Atty., New York City, of counsel.

Before SWAN, CLARK and FRANK, Circuit Judges.

SWAN, Circuit Judge.

This appeal presents the question whether the District Judge erred in refusing to issue a second writ of habeas corpus to review a decision of the Board of Immigration Appeals which denied the application of a deportable alien for suspension of deportation pursuant to section 19 of the Immigration Act of 1917 as amended, 8 U.S. C.A. § 155(c), of which the relevant portion reads as follows:

"In the case of any alien * * * who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may * * * suspend deportation of such alien * * * if he finds that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien. * * *"[1]

The appellant is an alien of Italian nativity and citizenship who entered the United States in 1932 with intent to remain permanently and without possessing an immigration visa. He has resided here continuously since entry, was married in 1949 to a legally resident alien, and has a two year old American-born child. Proceedings for his deportation were instituted in 1947 and, after a hearing, he was found deportable on the charge of illegal entry without an immigration visa. The proceedings were later reopened to receive further evidence concerning his application for suspension of deportation. Such discretionary relief was denied by the hearing officer in May 1952. His decision was thereafter adopted by the Acting Commissioner and was affirmed by the Board of Immigration Appeals on April 3, 1953. The Board's opinion reviewed the evidence and concluded with the statement: "After consideration of all the facts and circumstances in the case, we believe that the applications for relief should be denied as a matter of administrative discretion." Thereafter the appellant was taken into custody for deportation and he promptly sued out a writ of habeas corpus which Judge Noonan dismissed by order entered May 5, 1953.[2] This order was not appealed.[3] On May 16 the petition for issuance of a second writ was presented. This petition, like that on which the first writ issued, attacks only the Board's denial of discretionary relief. The charge on which the appellant has been found deportable is admitted. The case was heard on affidavits and oral argument without testimony being taken. Judge Clancy refused to issue the writ. Deportation has been stayed pending determination of the appeal from such refusal.

An order dismissing one writ of habeas corpus does not formally estop the relator from suing out another on the same grounds.[4] Nevertheless it may properly be given controlling weight if the same grounds are urged in a second writ.[5] The appellant contends that the second petition alleged new grounds of attack upon the administrative denial of suspension of deportation, namely, that the Board of Im-

1. This statute was repealed by the Immigration and Nationality Act of June 27, 1952, effective 180 days thereafter, and the provisions as to discretionary suspension of deportation were replaced by section 244 of the 1952 Act, 8 U.S.C.A. § 1254. However, the "savings clauses" of the later Act kept the earlier statute alive for pending proceedings, and provided that "An application for suspension of deportation under section 19 of the Immigration Act of 1917, as amended * * * which is pending on the date of enactment of this Act, shall be regarded as a proceeding within the meaning of this subsection." 8 U.S.C.A. § 1101 note. P.L. 414, § 405(a), 66 Stat. 280. The appellant's application was pending until the Board of Immigration Appeals rendered its decision on April 3, 1953.

2. Judge Noonan's memorandum decision reads: "A review of the record as a whole, fails to demonstrate that there was present a clear abuse of discretion or clear failure to exercise discretion. Absent either element this court cannot review the exercise of discretion by the Board of Immigration Appeals. (United States ex rel. Adel v. Shaughnessy [2 Cir.], 183 F.2d 371.)"

3. The appellant's brief on the present appeal admits that dismissal of the first writ was correct.

4. Salinger v. Loisel, 265 U.S. 224, 230, 44 S.Ct. 519, 68 L.Ed. 989; United States ex rel. McCann v. Thompson, 2 Cir., 144 F.2d 604, 606, 156 A.L.R. 240, certiorari denied 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630.

5. Wong Doo v. United States, 265 U.S. 239, 241, 44 S.Ct. 524, 68 L.Ed. 999; United States ex rel. McCann v. Thompson, supra; United States ex rel. Karpathiou v. Jordan, 7 Cir., 153 F.2d 810, certiorari denied 328 U.S. 868, 66 S.Ct. 1372, 90 L.Ed. 1639.

migration Appeals, improperly exercised its discretion (1) because it considered confidential information and other material outside the record, (2) because the case had been prejudged by the Attorney General, and (3) because other aliens similarly situated had been granted discretionary relief. These grounds were not alleged in the first petition. Ground (1) is alleged in paragraphs 11–16, ground (2) in paragraph 19, and ground (3) in paragraphs 9–10 of the second petition; they are printed in the margin.[6] These charges, alleged upon information and belief, were categorically denied in an opposing affidavit which also incorporated by reference the administrative record. There is absolutely nothing in that record to indicate that the administrative officials considered anything outside the record. Indeed the October 1952 list of "unsavory characters" and the press conference concerning it oc-

curred months after the hearing officer's decision and the Assistant Commissioner's adoption of it, and could not have influenced them. The Board's opinion discusses only the evidence in the record, and such evidence was amply sufficient to support discretionary denial of suspension of deportation. As this court said in United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489, 490, an alien has no privilege of inquiring into the grounds on which the Attorney General has denied suspension of deportation; "unless the ground stated is on its face insufficient, he must accept the decision, for it was made in the 'exercise of discretion,' which we have again and again declared that we will not review." In this respect the case at bar is unlike Alexiou v. McGrath, D.C.D.C., 101 F.Supp. 421, where it affirmatively appeared that evidence not of record was considered on the issue of eligibility for suspension of deportation.

6. "9. That on April 6, 1945, favorable discretionary relief was exercised herein in the form of voluntary departure and preexamination, but my husband was unable to take advantage of this because the American Consul refused to issue a visa to him on the ground that he had been convicted of a crime in 1934.

"10. That the aforesaid criminal ground may be waived by the Board of Immigration Appeals and in all similar cases has been waived by the Board of Immigration Appeals.

"11. Upon information and belief that the Department of Justice maintains a confidential file with respect to my husband.

"12. Upon information and belief that on or about October 2, 1952, the Attorney General announced at a press conference that he planned to deport certain so-called 'unsavory characters.'

"13. That upon information and belief, on or about October 2, 1952, the Attorney General prepared a list of one hundred individuals whose deportation he sought in accordance with the announcement made at his press conference of October 2, 1952.

"14. Upon information and belief, that included in this list of one hundred persons was the name of my husband, Joseph Accardi.

"15. Upon information and belief, that the aforesaid list of one hundred individuals, including the name of my hus-

band, was circulated by the Department of Justice among all its employees connected with the Immigration Service and the Board of Immigration Appeals.

"16. Upon information and belief, that because of the listing of my husband's name on this confidential list and because of consideration of matters outside the record of his immigration hearing, discretionary relief has been denied to permit my husband to adjust his immigration status to that of a permanent resident.

"17. That application was made during the month of May, 1953, for reconsideration of my husband's case and such reconsideration has resulted in a reaffirmance of the order of deportation herein.

"18. Upon information and belief that the Attorney General has issued several press releases with regard to my husband's case during the month of April, 1953, and because of the unfavorable publicity accorded to this case at the instigation of the Attorney General, it has not been possible to secure a fair reconsideration and rehearing of this matter.

"19. That the decision to deny favorable discretionary relief herein was prejudged by the Attorney General on October 2, 1952, when he included my husband's name in the list of one hundred so-called 'unsavory characters' and since that time it has been impossible for my husband to secure fair consideration of his case."

We may assume *arguendo,* as we did in United States ex rel. Weddeke v. Watkins, 166 F.2d 369, 371, certiorari denied 333 U.S. 876, 68 S.Ct. 904, 92 L.Ed. 1152, that since the Attorney General has provided by regulations the procedure by which a deportable alien is accorded a hearing on his application to suspend deportation, that he is entitled to procedural due process in the conduct of such hearing; that is, the requirements of a fair hearing must be met.[7] Nothing alleged in the petition for a second writ suggests that such requirements were not observed in the initial hearing or in the affirmance of the hearing officer's decision by the Assistant Commissioner of Immigration. The relator alleges "belief," based on the existence of the subsequently created list of undesirable aliens, that the Board of Immigration Appeals was influenced by this list in affirming the decision denying suspension. The allegation that the Attorney General had prejudged the application for discretionary relief by including the appellant's name in the October 1952 list is substantially only a reiteration of the first ground of complaint. That the Board considered matters outside the record was denied by the opposing affidavit, and the Board's opinion appears to corroborate such denial. In the opinion of a majority of the court, the assertion of a mere suspicion or "belief" that the Board considered other matters did not require the issuance of a second writ. Were this enough, every deportable alien would so allege, merely to delay his justifiable deportation.

The third ground of complaint, that "in all similar cases" the Board had exercised its discretion in favor of deportable aliens convicted of crime is completely without merit. Suspension of deportation is a discretionary matter. In the exercise of its discretion it is permissible for the Board to take into account the alien's earlier bad conduct. United States ex rel. Adel v. Shaughnessy, 2 Cir., 183 F.2d 371. The facts set out in the Board's opinion respecting his criminal record and his tenuously explained affluence were ample justification for denial of discretionary relief. Nor does the allegation that the appellant was treated differently from other aliens similarly situated raise a triable issue of fact. Determination of what weight to give to a prior conviction of crime necessarily depends upon the circumstances of the particular case. No two cases can be precisely similar. The appellant tries to bring himself within the scope of United States ex rel. Knauff v. McGrath, 2 Cir., 181 F.2d 839, vacated as moot, 340 U.S. 940, 71 S.Ct. 504, 95 L.Ed. 678, where it was alleged that the uniform practice was to defer deportation in all cases where a bill of relief was pending in Congress. There the uniform practice was a provable fact. It is not such when, as here, the alleged uniform practice relates to the appraisement of the moral reformation of convicted deportees.

Order affirmed.

FRANK, Circuit Judge (dissenting).

I dissent because I think the district judge erred in refusing to hear testimony, offered by the relator, to show that the hearing before the Board was a farce.

Suppose the Supreme Court were secretly to notify all judges of inferior federal courts that in the future it would reverse all judgments they entered if favorable to certain designated persons. Accardi's wife (in the second habeas corpus petition) asserts that we have here something of that sort—but worse. Let us see:

By a valid regulation,[1] having the effect of a law,[2] the Attorney General has provided that one who applies for discretionary relief under the statute shall receive a hearing before the Board of Immigration Appeals on his appeal from a decision, ad-

---

7. See also United States ex rel. Giacalone v. Miller, D.C.S.D.N.Y., 86 F.Supp. 655, 657; United States ex rel. Bauer v. Shaughnessy, D.C.S.D.N.Y., 115 F.Supp. ——; Chavez v. McGranery, D.C.S.D.Cal., 108 F.Supp. 255.

1. 8 C.F.R. (1949 ed. Pocket Part) §§ 150.7(a), (b), 150.11(b), 150.13(b), and Part 151, esp. §§ 151.2(e), 151.3(e), 151.5(e); note infra.

2. See, e.g., Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846; Mastrapasqua v. Shaughnessy, 2 Cir., 180 F. 2d 999, 1001.

verse to the applicant, made by the Commissioner or Acting Commissioner. Another regulation provides that the Attorney General may review and reverse any decision made by the Board.[2a] These regulations—which, while they stand, bind the Attorney General and his subordinates[3]—mean, I think, that decision by the Board or the Attorney General as to the grant or refusal of such relief must not be made until after a hearing by the Board.[4] If it can be shown that, as the relator alleged in the second petition for habeas corpus, the decision adverse to discretionary relief in Accardi's case was made by the Attorney General in 1952 before Accardi had had a Board hearing (in 1953), so that the purported Board hearing was but a sham, then it will appear that discretion has not been exercised as required by the regulation. In that event, habeas corpus should be granted, unless within a reasonable time an administrative decision is made on the basis of a Board hearing in accordance with the regulation and without regard to the pre-hearing decision by the Attorney General. See Mastrapasqua v. Shaughnessy, 2 Cir., 180 F.2d 999, 1003–1004. For while courts cannot review the exercise of administrative discretion nor themselves exercise it, they can and should compel its exercise where the officer vested with the discretion has failed to do so. Mastrapasqua v. Shaughnessy, supra, 180 F.2d at page 1002.

Relator alleged in the second habeas corpus petition that the pre-hearing decision consisted of the inclusion of Accardi's name in a secret list of aliens whom the Attorney General had decided must be expelled from the United States, this secret list having been circulated in October 1952 among all the Attorney General's subordinates in the Department of Justice, including the Board, and having since been approved with reference to Accardi by the present Attorney General—all previous to the administrative hearing on Accardi's petition for discretionary relief. Relator argues, in effect, that, since the Attorney General was the Board's superior, and since he could reverse any decision made by the Board concerning such relief,[5] his issuance in 1952 of the secret list obliged the Board in 1953 to refuse to exercise its discretion in Accardi's favor,[6] and compelled it to act without considering the countervailing evidence, e. g., that Accardi has lived in the

---

2a. 8 C.F.R. (1949 ed.) §§ 90.3, 90.12; cf. 8 C.F.R. (Rev. ed. 1952) § 1.2.

3. See, e.g., Bridges v. Wixon, 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103.

4. Cf. Alexiou v. McGrath, D.C., 101 F. Supp. 421.

5. See note 2a, supra.

6. Pertinent allegations of the petition were:
"12. Upon information and belief that on or about October 2, 1952, the Attorney General announced at a press conference that he planned to deport certain so-called 'unsavory characters.'
"13. That upon information and belief, on or about October 2, 1952, the Attorney General prepared a list of one hundred individuals whose deportation he sought in accordance with the announcement made at his press conference of October 2, 1952.
"14. Upon information and belief, that included in this list of one hundred persons was the name of my husband, Joseph Accardi.
"15. Upon information and belief, that the aforesaid list of one hundred individuals, including the name of my husband, was circulated by the Department of Justice among all its employees connected with the Immigration Service and the Board of Immigration Appeals.
"16. Upon information and belief, that because of the listing of my husband's name on this confidential list and because of consideration of matters outside the record of his immigration hearing, discretionary relief has been denied to permit my husband to adjust his immigration status to that of a permanent resident. * * *
"19. That the decision to deny favorable discretionary relief herein was prejudged by the Attorney General on October 2, 1952, when he included my husband's name in the list of one hundred so-called 'unsavory characters' and since that time it has been impossible for my husband to secure fair consideration of his case.
"20. That the present Attorney General has continued the policies and practices of his predecessor with reference to my husband's case."

United States for 21 years, is the husband of a lawful resident of the United States and the father of a two-year-old American-born child. Respondent, in his traverse in the district court, denied the allegation of prejudgment. But relator's counsel proposed in the district court to prove the contrary by evidence to be adduced in court. He proposed to prove, not only the specific facts alleged in the habeas corpus petition concerning the Attorney General's prejudgment, but also that Accardi's former counsel had been told by the Commissioner, "We can't do a thing" in Accardi's case "because the Attorney General has his name on that list." [7] Yet the district judge refused to hear any testimony, i. e., refused to conduct a trial to determine whether relator's allegations or respondent's denials were true.

Obviously, we would reverse if the Board in its opinion had said: "We deny relief because the Attorney General has already decided, previous to the application for relief, that Accardi is not to receive any discretionary relief." So the crucial question here is whether relator had a right to prove, by evidence outside the record, that in truth such was the ground of the Board's action. My colleagues, accepting the district judge's view, take this position: Even if it is a fact that Accardi's application for relief was unlawfully prejudged by the Attorney General so that the Board's hearing was a pure pretense, nevertheless no court can pay any attention to that fact. Why? Because, so my colleagues maintain, (1) the record of the administrative hearing and the opinion of the Board contain no reference to the Attorney General's list, and, on their face, disclose nothing to indicate any irregularity; (2) the courts lack power to go behind such an administrative record; (3) relator's allega-

tions as to the Attorney General's prejudgment are "on information and belief."

I cannot agree. Respondent's "nice, sharp quillets of the law" should not take us in. There is no doctrine that a court may never go outside such an official record to discover whether an official himself unlawfully acted on matters outside the record. Having served for a considerable period as an administrative officer, I am fairly callous to the cries of men who denounce all such officers as power-hungry bureaucrats, and I am perhaps unusually aware of the danger to the workings of government if any administrative officer could be dragged into court, to stand trial, on a mere suspicion of impropriety behind the scenes. However, there would be greater danger to democratic government in judicial acceptance of every administrative record as final and invulnerable, no matter how grave and serious the charges against the official.

While ordinarily a court must confine itself to the administrative record,[8] there are exceptions. Even a court's judgment, valid so far as the judicial record goes, will be vacated years later if it be then proved, by evidence entirely beyond the bounds of the record, to have been procured by bribery of a judge. Root Refining Co. v. Universal Products Oil Co., 3 Cir., 169 F.2d 514. And the same doctrine applies if the judgment resulted from what amounts to a judge's decision of a case made before it began.[9] Ours would be a sorry legal system if it completely shielded from attack a judge's or other official's order simply because the facts revealing its illegality are not in the official record on which the order purports to rest. To confer such immunity would be to make legality a matter of sheer ritualism, of mere outward looks. That way lies tyranny.

7. Relator's counsel, on the hearing of the petition, said he understood "that former counsel in this case spoke to the Commissioner and the Commissioner told him, 'We can't do a thing in your case because the Attorney General has his name on that list of a hundred.'"

8. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429; Chicago, B. & Q. R. Co. v. Babcock, 204 U.S. 585, 588, 593, 27 S.Ct. 326, 51 L. Ed. 636; Fayerweather v. Ritch, 195 U. S. 276, 306–307, 25 S.Ct. 58, 49 L.Ed. 193.

9. See Schwab v. Coleman, 4 Cir., 145 F. 2d 672, 156 A.L.R. 355.

My colleagues say that "there is absolutely nothing in the record to indicate that the administrative officials considered anything outside the record." But the same was true in the Root Refining case, *i. e.,* the record was obviously silent as to the bribery of the judge which brought about the decision, since necessarily that was a secret fact—in that respect like the Attorney General's list. Moreover, relief by habeas corpus inherently involves judicial reliance on facts not in the record supporting the judgment which habeas corpus collaterally attacks.[9a]

Of course, an attack on an official's decision, by recourse to off-the-record evidence, is not allowed if the allegations are vague: Legality should be more than well-ordered paper work, but allowable peering behind the paper facade has its limits. One may not compel an official to submit to courtroom interrogation in the search for possible concealed, unlawful behavior, unless one first brings forward some striking traces of it. As a consequence, well-concealed misconduct may escape judicial correction.[10] That is the price we pay to avoid having governmental action at the mercy of anyone who voices mere suspicions. For instance, to open up the judgment in the Root Refining case, it would not have sufficed to allege, without more, "The judge was bribed." There must be an offer to prove specific facts which will pretty plainly impugn the official record.

Relator here satisfied that requirement:

Not only did she offer proof of the Attorney General's list—a secret, official document of marked evidentiary significance tending strongly to show that the Attorney General had stripped the Board of discretion in Accardi's case—but she also offered to prove that the Commissioner of Immigration had said to Accardi's counsel that such was the purpose and effect of including Accardi's name in that list.

Finally, I disagree with my colleagues when they say that no attention may be paid to the allegation of secret prejudgment by the Attorney General because it is made on information and belief. Surely we would not refuse to act in a case like Root Refining on a sufficiently specific charge that a judge had been bribed to decide the case, merely because the facts, necessarily not within the first-hand knowledge of the party so charging, were stated on such information and belief. In a variety of circumstances, it has been held that such an allegation suffices where, as here, the asserted facts are thus not within affiant's personal knowledge.[10a] I think the district court should be directed to afford relator an opportunity to prove those facts, just as in the Root Refining case the Supreme Court ordered a trial of the movant's charge of bribery.[11] I do not for a moment intimate that relator's allegations are true; I urge only that we ought not now assume that they are false. It will not do, I think, to hold it enough that the outside of the administrative cup is clean.[12]

9a. See Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543.

10. See, e.g., Broadcast Music v. Havana Madrid Restaurant Corp., 2 Cir., 175 F. 2d 77, 80.

10a. See, e.g., Berger v. United States, 255 U.S. 22, 34–35, 41 S.Ct. 230, 65 L.Ed. 481; Kelly v. United States, 9 Cir., 250 F. 947, 948–949; Creekmore v. United States, 8 Cir., 237 F. 743.

11. Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447.

12. "For ye make clean the outside of the cup and platter, but within they are full of extortion and excess." Matt. 23, 25.