UNITED STATES ᴇx ʀᴇʟ. ACCARDI *v.* SHAUGH-NESSY, DISTRICT DIRECTOR OF THE IMMI-GRATION AND NATURALIZATION SERVICE.

No. 366. Argued February 2, 1954.—Decided March 15, 1954.

*Jack Wasserman* argued the cause and filed a brief for petitioner.

*Marvin E. Frankel* argued the cause for respondent. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Olney, Beatrice Rosenberg* and *Robert G. Maysack.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a habeas corpus action in which the petitioner attacks the validity of the denial of his application for suspension of deportation under the provisions of § 19 (c) of the Immigration Act of 1917.[1] Admittedly deport-

---

[1] 39 Stat. 889, as amended, 8 U. S. C. (1946 ed., Supp. V) § 155 (c). Section 405 is the savings clause of the Immigration and Nationality Act of 1952 and its subsection (a) provides that:

"Nothing contained in this Act, unless otherwise specifically provided therein, shall be construed to affect the validity of any . . . proceeding which shall be valid at the time this Act shall take effect; or to affect any . . . proceedings . . . brought . . . at the time this Act shall take effect; but as to all such . . . proceedings, . . . the statutes or parts of statutes repealed by this Act are, unless otherwise specifically provided therein, hereby continued in force and effect. . . . An application for suspension of deportation under section 19 of the Immigration Act of 1917, as amended, . . . which is pending on the date of enactment of this Act [June 27, 1952], shall be regarded as a proceeding within the meaning of this subsection." 66 Stat. 280, 8 U. S. C. (1952 ed.), p. 734.

Since Accardi's application for suspension of deportation was made in 1948, § 19 (c) of the 1917 Act continues to govern this proceeding rather than its more stringent equivalent in the 1952 Act, § 244, 66 Stat. 214, 8 U. S. C. (1952 ed.) § 1254.

able, the petitioner alleged, among other things, that the denial of his application by the Board of Immigration Appeals was prejudged through the issuance by the Attorney General in 1952, prior to the Board's decision, of a confidential list of "unsavory characters" including petitioner's name, which made it impossible for him "to secure fair consideration of his case." The District Judge refused the offer of proof, denying the writ on the allegations of the petitioner without written opinion. A divided panel of the Court of Appeals for the Second Circuit affirmed. 206 F. 2d 897. We granted certiorari. 346 U. S. 884.

The Justice Department's immigration file on petitioner reveals the following relevant facts. He was born in Italy of Italian parents in 1909 and entered the United States by train from Canada in 1932 without immigration inspection and without an immigration visa. This entry clearly falls under § 14 of the Immigration Act of 1924 [2] and is the uncontested ground for deportation. The deportation proceedings against him began in 1947. In 1948 he applied for suspension of deportation pursuant to § 19 (c) of the Immigration Act of 1917. This section as amended in 1948 provides, in pertinent part, that:

> "In the case of any alien (other than one to whom subsection (d) of this section is applicable) who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may . . . suspend deportation of such alien if he is not ineli-

[2] "Any alien who at any time after entering the United States is found to have been at the time of entry not entitled under this Act to enter the United States . . . shall be taken into custody and deported in the same manner as provided for in sections 19 and 20 of the Immigration Act of 1917 . . . ." 43 Stat. 162, 8 U. S. C. (1946 ed.) § 214. This ground for deportation is perpetuated by § 241 (a) (1) and (2) of the Immigration and Nationality Act of 1952. 66 Stat. 204, 8 U. S. C. (1952 ed.) § 1251 (a) (1) and (2).

gible for naturalization or if ineligible, such ineligibility is solely by reason of his race, if he finds (a) that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien; or (b) that such alien has resided continuously in the United States for seven years or more and is residing in the United States upon July 1, 1948." 8 U. S. C. (1946 ed., Supp. V) § 155 (c).

Hearings on the deportation charge and the application for suspension of deportation were held before officers of the Immigration and Naturalization Service at various times from 1948 to 1952. A hearing officer ultimately found petitioner deportable and recommended a denial of discretionary relief. On July 7, 1952, the Acting Commissioner of Immigration adopted the officer's findings and recommendation. Almost nine months later, on April 3, 1953, the Board of Immigration Appeals affirmed the decision of the hearing officer. A warrant of deportation was issued the same day and arrangements were made for actual deportation to take place on April 24, 1953.

The scene of action then shifted to the United States District Court for the Southern District of New York. One day before his scheduled deportation petitioner sued out a writ of habeas corpus. District Judge Noonan dismissed the writ on April 30 and his order, formally entered on May 5, was never appealed. Arrangements were then made for petitioner to depart on May 19.[3] However, on May 15, his wife commenced this action by filing a petition for a second writ of habeas corpus.[4] New

---

[3] Meanwhile, Accardi moved the Board of Immigration Appeals to reconsider his case. The motion was denied on May 8.

[4] *Res judicata* does not apply to proceedings for habeas corpus. *Salinger* v. *Loisel,* 265 U. S. 224 (1924); *Wong Doo* v. *United States,* 265 U. S. 239 (1924).

grounds were alleged, on information and belief, for attacking the administrative refusal to suspend deportation.[5] The principal ground is that on October 2, 1952—after the Acting Commissioner's decision in the case but before the decision of the Board of Immigration Appeals—the Attorney General announced at a press conference that he planned to deport certain "unsavory characters"; on or about that date the Attorney General prepared a confidential list of one hundred individuals, including petitioner, whose deportation he wished; the list was circulated by the Department of Justice among all employees in the Immigration Service and on the Board of Immigration Appeals; and that issuance of the list and related publicity amounted to public prejudgment by the Attorney General so that fair consideration of petitioner's case by the Board of Immigration Appeals was made impossible. Although an opposing affidavit submitted by government counsel denied "that the decision was based on information outside of the record" and contended that the allegation of prejudgment was "frivolous," the same counsel repeated in a colloquy with the

---

[5] The first ground was that "in all similar cases the Board of Immigration Appeals has exercised favorable discretion and its refusal to do so herein constitutes an abuse of discretion." This is a wholly frivolous contention, adequately disposed of by the Court of Appeals. 206 F. 2d 897, 901. Another allegation charged "that the Department of Justice maintains a confidential file with respect to [Joseph Accardi]." But at no place does the petition elaborate on this charge, nor does the petition allege that discretionary relief was denied because of information contained in a confidential file. Although the petition does allege that "because of consideration of matters outside the record of his immigration hearing, discretionary relief has been denied," this allegation seems to refer to the "confidential list" discussed in the body of the opinion. Hence we assume that the charge of reliance on confidential information merely repeats the principal allegation that the Attorney General's prejudgment of Accardi's case by issuance of the "confidential list" caused the Board to deny discretionary relief.

court a statement he had made at the first habeas corpus hearing—"that this man was on the Attorney General's proscribed list of alien deportees."

District Judge Clancy did not order a hearing on the allegations and summarily refused to issue a writ of habeas corpus. An appeal was taken to the Court of Appeals for the Second Circuit with the contention that the allegations required a hearing in the District Court and that the writ should have been issued if the allegations were proved. A majority of the Court of Appeals' panel thought the administrative record amply supported a refusal to suspend deportation; found nothing in the record to indicate that the administrative officials considered anything but that record in arriving at a decision in the case; and ruled that the assertion of mere "suspicion and belief" that extraneous matters were considered does not require a hearing. Judge Frank dissented.

The same questions presented to the Court of Appeals were raised in the petition for certiorari and are thus properly before us. The crucial question is whether the alleged conduct of the Attorney General deprived petitioner of any of the rights guaranteed him by the statute or by the regulations issued pursuant thereto.

Regulations [6] with the force and effect of law [7] supplement the bare bones of § 19 (c). The regulations prescribe the procedure to be followed in processing an alien's application for suspension of deportation. Until

---

[6] The applicable regulations in effect during most of this proceeding appear at 8 CFR, 1949, Pts. 150 and 90 and 8 CFR, 1951 Pocket Supp., Pts. 150, 151 and 90. The corresponding sections in the 1952 revision of the regulations, promulgated pursuant to the Immigration and Nationality Act of 1952, may be found at 8 CFR, Rev. 1952, Pts. 242–244 and 6; 8 CFR, 1954 Pocket Supp., Pts. 242–244 and 6; 19 Fed. Reg. 930.

[7] See *Boske* v. *Comingore*, 177 U. S. 459 (1900); *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S. 149, 155 (1923); *Bridges* v. *Wixon*, 326 U. S. 135, 150–156 (1945).

the 1952 revision of the regulations, the procedure called for decisions at three separate administrative levels below the Attorney General—hearing officer, Commissioner, and the Board of Immigration Appeals. The Board is appointed by the Attorney General, serves at his pleasure, and operates under regulations providing that: "In considering and determining . . . appeals, the Board of Immigration Appeals shall exercise such discretion and power conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case. The decision of the Board . . . shall be final except in those cases reviewed by the Attorney General . . . ." 8 CFR, 1949, § 90.3 (c). See 8 CFR, Rev. 1952, § 6.1 (d)(1). And the Board was required to refer to the Attorney General for review all cases which:

> "(a) The Attorney General directs the Board to refer to him.
>
> "(b) The chairman or a majority of the Board believes should be referred to the Attorney General for review of its decision.
>
> "(c) The Commissioner requests be referred to the Attorney General by the Board and it agrees." 8 CFR, 1949, § 90.12. See 8 CFR, Rev. 1952, § 6.1 (h)(1).

The regulations just quoted pinpoint the decisive fact in this case: the Board was required, as it still is, to exercise its own judgment when considering appeals. The clear import of broad provisions for a final review by the Attorney General himself would be meaningless if the Board were not expected to render a decision in accord with its own collective belief. In unequivocal terms the regulations delegate to the Board discretionary authority as broad as the statute confers on the Attorney General; the scope of the Attorney General's discretion became the yardstick of the Board's. And if the word "discre-

tion" means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience. This applies with equal force to the Board and the Attorney General. In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner.

We think the petition for habeas corpus charges the Attorney General with precisely what the regulations forbid him to do: dictating the Board's decision. The petition alleges that the Attorney General included the name of petitioner in a confidential list of "unsavory characters" whom he wanted deported; public announcements clearly reveal that the Attorney General did not regard the listing as a mere preliminary to investigation and deportation; to the contrary, those listed were persons whom the Attorney General "planned to deport." And, it is alleged, this intention was made quite clear to the Board when the list was circulated among its members. In fact, the Assistant District Attorney characterized it as the "Attorney General's proscribed list of alien deportees." To be sure, the petition does not allege that the "Attorney General ordered the Board to deny discretionary relief to the listed aliens." It would be naive to expect such a heavy-handed way of doing things. However, proof was offered and refused that the Commissioner of Immigration told previous counsel of petitioner, "We can't do a thing in your case because the Attorney General has his [petitioner's] name on that list of a hundred." We believe the allegations are quite sufficient where the body charged with the exercise of discretion is a nonstatutory board composed of subordinates within a department headed by the individual who formulated, announced, and circulated such views of the pending proceeding.

It is important to emphasize that we are not here reviewing and reversing the *manner* in which discretion was exercised. If such were the case we would be discussing the evidence in the record supporting or undermining the alien's claim to discretionary relief. Rather, we object to the Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations.

If petitioner can prove the allegation, he should receive a new hearing before the Board without the burden of previous proscription by the list. After the recall or cancellation of the list, the Board must rule out any consideration thereof and in arriving at its decision exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right.[8] Of course, he may be unable to prove his allegation before the District Court; but he is entitled to the opportunity to try. If successful, he may still fail to convince the Board or the Attorney General, in the exercise of their discretion, that he is entitled to suspension, but at least he will have been afforded that due process required by the regulations in such proceedings.

*Reversed.*

MR. JUSTICE JACKSON, whom MR. JUSTICE REED, MR. JUSTICE BURTON, and MR. JUSTICE MINTON join, dissenting.

We feel constrained to dissent from the legal doctrine being announced. The doctrine seems proof of the adage that hard cases make bad law.

Peculiarities which distinguish this administrative decision from others we have held judicially reviewable must be borne in mind. The hearings questioned here as to their fairness were not hearings on which an order

---

[8] See the *Bilokumsky* and *Bridges* cases cited in note 7, *supra*.

of deportation was based and which, under some limitations, may be tested by habeas corpus. *Ekiu* v. *United States,* 142 U. S. 651. Neither is this a case involving questioned personal status, as whether one is eligible for citizenship, which we have held reviewable under procedures for declaratory judgment and injunction. *McGrath* v. *Kristensen,* 340 U. S. 162. Petitioner admittedly is in this country illegally and does not question his deportability or the validity of the order to deport him. The hearings in question relate only to whether carrying out an entirely legal deportation order is to be suspended.

Congress vested in the Attorney General, and in him alone, discretion as to whether to suspend deportation under certain circumstances. We think a refusal to exercise that discretion is not reviewable on habeas corpus, first, because the nature of the power and discretion vested in the Attorney General is analogous to the power of pardon or commutation of a sentence, which we trust no one thinks is subject to judicial control; and second, because no legal right exists in petitioner by virtue of constitution, statute or common law to have a lawful order of deportation suspended. Even if petitioner proves himself eligible for suspension, that gives him no right to it as a matter of law but merely establishes a condition precedent to exercise of discretion by the Attorney General. Habeas corpus is to enforce legal rights, not to transfer to the courts control of executive discretion.

The ground for judicial interference here seems to be that the Board of Immigration Appeals did find, or may have found, against suspension on instructions from the Attorney General. Even so, this Board is neither a judicial body nor an independent agency. It is created by the Attorney General as part of his office, he names its members, and they are responsible only to him. It operates under his supervision and direction, and its every

decision is subject to his unlimited review and revision. The refusal to suspend deportation, no matter which subordinate officer actually makes it, is in law the Attorney General's decision. We do not think its validity can be impeached by showing that he overinfluenced members of his own staff whose opinion in any event would be only advisory.

The Court appears to be of the belief that habeas corpus will issue to review a decision by the Board. It is treating the Attorney General's regulations as if they vested in the Board final authority to exercise his discretion. But, in our view, the statute neither contemplates nor tolerates a redelegation of his discretion by the Attorney General so as to make the decision of the Board, even if left standing by him, final in the sense of being subject to judicial review as the Board's own decision. Even the Attorney General was not entrusted with this discretion free of all congressional control, for Congress specifically reserved to itself power to overrule his acts of grace. 54 Stat. 672, 8 U. S. C. (1946) § 155 (c), as amended, 8 U. S. C. (Supp. V) § 155 (c). It overtaxes our naïveté about politics to believe Congress would entrust the power to a board which is not the creature of Congress and whose members are not subject to Senate confirmation.

Cases challenging deportation orders, such as *Bridges* v. *Wixon,* 326 U. S. 135, whatever their merits or demerits, have no application here. In cases where the question is the validity of a deportation order, habeas corpus will issue at least to review jurisdictional questions. In those cases, also, the petitioner has a legal right to assert, *viz.,* a private right not to be deported except upon grounds prescribed by Congress. Neither the validity of deportation nor a private right is involved here.

Of course, it may be thought that it would be better government if even executive acts of grace were subject to judicial review. But the process of the Court seems adapted only to the determination of legal rights, and here the decision is thrusting upon the courts the task of reviewing a discretionary and purely executive function. Habeas corpus, like the currency, can be debased by over-issue quite as certainly as by too niggardly use. We would affirm and leave the responsibility for suspension or execution of this deportation squarely on the Attorney General, where Congress has put it.