**UNITED STATES of America, Plaintiff,**

v.

**EXXON CORPORATION, Defendant.**

**Civ. A. No. 78–1035.**

United States District Court, District of Columbia.

May 17, 1979.

Paul Wallach, Larry P. Ellsworth, Richard Levi, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

David J. Beck, John P. Venzke, David L. Tolin, Fulbright, Jaworski, Houston, Tex., Warren Belmar, David R. Johnson, Fulbright & Jaworski, Washington, D. C., Barbara B. Finney, Exxon Corp., Houston, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

FLANNERY, District Judge.

This case involves alleged overpricing in the sale of crude oil, for which the United States seeks to recover 183 million dollars. It began as an administrative proceeding, and might have continued in that forum had the defendant not filed an action for declaratory relief in the Northern District of Texas to resolve certain "purely legal

issues."[1] The Department of Energy ("DOE") responded by filing a suit of its own in this court. Thereupon Exxon filed a motion to dismiss for want of subject matter jurisdiction, alleging that the Department of Energy must exhaust its administrative procedures before coming to the courthouse. This result is said to flow from (1) the creation by Congress of detailed administrative procedures for the issuance of remedial orders, which implicitly repealed or limited a statute that would allow the DOE to come directly to court; and (2) the *Accardi*[2] doctrine, which mandates that an agency must follow its own established regulations and procedures.

This argument was ably briefed by both parties. After consideration of the motion to dismiss and the opposition thereto, and a review of the structure and legislative history of the Department of Energy's statutory authority, the court concludes that Exxon's Motion is supported neither by the pertinent legislative history nor by precedent. The court will accordingly deny the motion to dismiss.

## I.

### REGULATORY AND PROCEDURAL BACKGROUND

To facilitate an understanding of the issues raised in this motion to dismiss, the court will trace briefly the factual and regulatory context of this case. The Department of Energy is charged with the enforcement of price controls which at the time of the events giving rise to this action governed the production and first sale of domestically produced crude petroleum. *See* Economic Stabilization Act of 1970 ("ESA"), § 203, 12 U.S.C. § 1904 note (1976); Emergency Petroleum Allocation

Act of 1973 ("EPAA"), § 4(a), *as amended,* 15 U.S.C. § 753(a) (1976); Department of Energy Organization Act, ("DOEOA" or "DOE Act"), 42 U.S.C.A. §§ 7131–7352 (Supp.1978); Executive Order 11695 (January 12, 1973) (delegation of power granted to President by ESA); Executive Order 11748 (December 6, 1973) (delegation to Federal Energy Office of power granted to President by EPAA); Executive Order 11790 (June 27, 1974) (abolition of Federal Energy Office; transfer of authority to Federal Energy Administration ("FEA")); Executive Order 12009 (September 15, 1977) (transfer of delegated authority from FEA to DOE). Pursuant to this mandate, the DOE has established a two-tier pricing framework for domestic sales of crude oil in an attempt to stabilize the price of petroleum products while providing some incentive for increased petroleum production. The essential characteristic of this two-tier system is a distinction between "old oil" and "new oil".

The DOE distinguishes "old oil" from "new oil" by reference to a "base production control level" [hereinafter sometimes referred to as "BPCL"] which is determined by measuring the total number of barrels produced in a given base period. *See* 10 C.F.R. § 212.72 (1978).[3] "New crude oil" is the total number of barrels produced in a given field in a period of time, less the base period control level. *Id.* This new oil, which represents an increase in production over the base period, may be sold at a higher price, known as the "upper tier ceiling price." *Id.* § 212.74. Old oil is restricted to a lower tier ceiling price. *Id.* § 212.73. The purpose of this complicated structure is to prevent profiteering in the sale of crude oil from fields which were in production prior to 1972, while providing an incentive

1. Transcript of March 16, 1979 Hearing on Motion to Dismiss, p. 6 [hereinafter referred to as "Hearing Transcript"].

2. *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (agency failure to comply with its own regulations violates due process).

3. The court recognizes that Section 212.72 contains different definitions of BPCL for the periods before and after January 31, 1976, and that these definitions have an impact on certain issues raised in this case. These matters need not be addressed in great detail in the present posture of the case.

for field openings or production increases since 1972.[4]

The defendant, from September 1, 1973 through December 31, 1976, was the operator of an oil field known as the Hawkins Field Unit, in Wood County, Texas. The Hawkins field is presently a "unitized field," as defined by the DOE.[5] The unitization, which became effective on January 1, 1975, was designed to improve the efficiency of the field by initiating a program of inert gas injection. This procedure would have had the effect of shifting reservoir fluids across existing lease lines, a procedure which would have been illegal under state law unless the field were unitized. (Complaint ¶¶ 26–29) Because the unification took place after 1972, it fell within Federal Energy Administration attempts to grapple with the definition of "property" for purposes of determining a "base production control level" for unitized fields. In September, 1975, the FEA ruled that if a field is unitized after 1972, the unit BPCL is to be determined by reference to the total 1972 monthly production from all of the individual leases in the unit. The FEA reasoned that a different result would allow a single operator successfully to evade ceiling tier prices by manipulating production among the wells in a given unitized field. Rule 1975–15, 40 Fed.Reg. 40832 (1975). The original ruling required the implementation of a unit BPCL immediately upon unification. *Id.*

This last requirement subsequently was rescinded, apparently in recognition of the time lag between a unitization and any real changes in production, to permit producers to implement a unit BPCL either on the effective date of the unitization or at the time that production patterns underwent a "significant alteration." *See* 41 Fed.Reg. 4931 (February 3, 1976). This rescission, which took place on February 1, 1976, was followed on September 1, 1976, by a detailed definition of "significant alteration in producing patterns." 41 Fed.Reg. 36171 (August 26, 1976); *see* 10 C.F.R. § 212.75 (1978).

In January, 1977, the FEA clarified the effect of the detailed definition of "significant alteration in producing patterns." The clarification indicated that units formed before February 1, 1976, like the Hawkins Field Unit, were not controlled by the new definition, but that the definition would be used as "guidance" in such cases. Ruling 1977–2, 42 Fed.Reg. 4409 (1977). The FEA also stated that it would permit unit operators to attempt to justify a date of "significant alteration in producing patterns" on reasonable bases other than those specified in the definition.

On January 10, 1978, the Department of Energy issued a "Notice of Probable Violation" to Exxon Company, U.S.A., a division of the defendant, alleging that Exxon Company had engaged in certain activities in anticipation of the inert gas injection enhanced recovery program, that this had caused a dramatic change in production patterns, and that Exxon had continued to calculate amounts of "new," "released," and "stripper well" crude oil on a lease-by-lease basis until September, 1976. This, together with continued computation on an allegedly improper basis after September, 1976, allegedly resulted in the sale of "old" oil as "new" oil at the higher ceiling price, resulting in overcharges in $183,305,019.79.

In compliance with DOE procedures,[6] Exxon filed a response to the Notice of

---

4. DOE regulations also provide for the release of old oil from the lower ceiling price under certain conditions, 10 C.F.R. § 212.75 (1978), and for limitations on new oil sales in the event of "current cumulative deficiency" in old oil production. 10 C.F.R. § 212.72 (1978). Again, these matters need not be addressed in detail in the present posture of the case.

5. DOE defines a "unitization" as "an aggregation of separate property interests into a single right to produce under a unitization agree-

ment." (Plaintiff's Mem. in Opp. to Def. Motion to Dismiss, p. 6 n.4); *see* 10 C.F.R. § 212.75 (1978). The Hawkins Field has 302 working interest owners and approximately 2,200 royalty interest owners. (Defendant's Mem. in Support of Motion to Dismiss, p. 1).

6. The Department of Energy's procedural framework for issuing and adjudicating Notices of Probable Violations (NOPV's) is set forth in Subpart O of 10 C.F.R. Part 205. The recently amended regulations (amendments effective

Probable Violation ("NOPV") on February 13, 1978. This response took issue with the facts supporting the NOPV, challenged the validity of certain regulations and rulings, and objected to the retroactive application of certain other regulations and rulings. Exxon also responded by filing a suit for declaratory relief in the United States District Court for the Northern District of Texas. *Exxon Corporation v. DOE,* No. 3–78–0420–W (N.D.Tex. filed April 11, 1978). That matter is presently under advisement on various motions, with the presiding judge apparently awaiting the outcome of the present motion to dismiss. Both parties agree that the Texas suit raises substantially the same legal issues as did the administrative proceeding.

The Department of Energy then requested permission from the Attorney General to file this suit, which was filed on June 8, 1978. It contains allegations identical to those in the administrative NOPV proceeding, which was terminated on June 9, 1978.

## II.

## SUBSEQUENT LEGISLATION DID NOT DEPRIVE THE DEPARTMENT OF ENERGY OF DUAL ENFORCEMENT AUTHORITY

The defendant characterizes this action as a bold and blatant circumvention of DOE's own administrative procedures, and argues that "Congress conditioned jurisdiction upon the requirement that the DOE first proceed through its administrative compliance process, which includes a review by the independent Federal Energy Regulatory Commission ("FERC")." (Memorandum in Support of Motion to Dismiss, p. 4). Exxon recognizes that Section 205 of the Economic Stabilization Act of 1970 originally provided DOE's predecessors with the authority to go to court without first resorting to administrative procedures. Exxon argues, however, that subsequent legislation establishing administrative machinery for DOE and its predecessors "completely changed" the

January 6, 1978) contain a detailed series of procedures leading to the issuance of a final

statutory scheme. First, Exxon maintains that amendments to the Economic Stabilization Act in 1971 "signalled the character and nature of the limitations to be placed on the . . . judicial enforcement power." (*Id.* at 7). Second, according to Exxon, the agency's own practice since 1971 confirms the absence of judicial enforcement power. Finally, Exxon maintains that the establishment by Congress of a complex and detailed administrative enforcement scheme in the Department of Energy Organization Act reinforced a Congressional restriction on direct access to the courts.

The Department of Energy urges the court to look to the plain language of Section 209 of the Economic Stabilization Act, *as amended,* 12 U.S.C. § 1904 note (1976), which contains no requirement that DOE exhaust its administrative procedures. The DOE also urges the court to refrain from repealing by implication a facially clear statute, particularly when the intent of Congress, according to the DOE, was not to bar direct suits, but to provide for procedural protections in those cases that were processed administratively.

The court embarks on this interpretive journey by examining the language of the statute. Section 209 of the Economic Stabilization Act of 1970, *as amended,* 12 U.S.C. § 1904 note (1976), applicable to the DOE through Section 5(a)(1) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1) (1976), states:

> *Whenever it appears* to any person authorized by the President to exercise authority under this title *that any individual or organization has engaged,* is engaged, or is about to engage in any acts or practices constituting a violation of any order or regulation under this title, *such person may request the Attorney General to bring an action in the appropriate district court of the United States to enjoin such acts or practices,* and upon a proper showing a temporary restraining order or a preliminary or permanent injunction shall

administrative order. *See* 43 Fed.Reg. 1930–1937 (1978).

be granted without bond. Any such court may also issue mandatory injunctions commanding any person to comply with any such order or regulation. *In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation.* (emphasis added)

The predecessor of Section 209 was Section 205 of the ESA of 1970, 84 Stat. 796. It contained essentially the same language, but without the clarification requiring the agency to request the Attorney General to bring the action, and without the provision in the final sentence clarifying the court's power to order restitution. Exxon recognizes that the original section 205 empowered the agencies exercising authority under the Act to go directly to court, but contends that this power was granted *only* because of the absence of administrative procedures in the ESA of 1970. (Memorandum in Support of Motion to Dismiss, p. 6–7).

In 1971 Congress decided, partly at the urging of the President, to amend the ESA of 1970. Exxon maintains that the expressions of legislative intent which accompanied these amendments made it clear that Congress intended that the agency employ administrative procedures before proceeding to court. This contention, however, is unsupported by the legislative history of the amendments.

II.A. *Economic Stabilization Act Amendments of 1971*

The 1971 amendments to the ESA of 1970 were introduced as an administration bill on October 19, 1971. The Senate Committee on Banking, Housing, and Urban Affairs held hearings on the bill in early November, and reported a clean bill (S. 2891) to the Senate on November 18, 1971. The original bill contained a Section 205, which is identical to the present Section 209. It also contained a section 207, exempting functions exercised under the Act from the provisions of the Administrative Procedure Act, and a section 208, providing for judicial review. *See* Economic Stabilization Legislation:

Hearings on S. 2712 before the Senate Committee on Banking, Housing, and Urban Affairs, 92d Cong., 1st Sess. 3–9 (1971).

Contrary to the position taken by Exxon, the Hearings do not indicate in any way that the Congress contemplated limiting the agency's power to proceed to court without first resorting to the administrative process. The comments made by L. Patrick Gray, the ABA representatives, and others focused, as Exxon admits, on the applicability of the Administrative Procedure Act. *Id.* at 19–20. (statement by Charles L. Walker, Under Secretary of the Treasury); 33, 43, 50–51, 56 (statements by L. Patrick Gray regarding section 208 and ability of individual to go to court). The "Gray Memorandum" was submitted to clarify the Administration's position on this point and to set forth the reasons justifying a partial exemption from the APA. *Id.* at 90–94. It is true that the "Gray Memorandum" stated that "[i]t is expected that this review process will proceed first through the administrative review steps provided by the agency regulations." *Id.* at 93. This comment was made, however, in the course of the discussion of sections 207 and 208. Nowhere does the "Gray Memorandum" evince an intent to render nugatory the expanded scope of Section 205. A similar conclusion is compelled by an examination of the comments of the American Bar Association. *Id.* at 169 ("[o]ur interest . . . centers about Section 207 which excludes the functions . . . from the operation of the Administrative Procedure Act"). Therefore, after reviewing the hearings, the court concludes that the Committee was concerned not with preventing agencies from going directly to court, but with providing adequate procedural protections for those matters which were addressed at the agency level while ensuring speed and consistency in decisions.

This conclusion finds support in the later history of the Act. The Senate report discusses Section 207 and the applicability of the APA, directs the agencies to issue regulations providing a method for obtaining interpretations of or exceptions from rules, and refers to L. Patrick Gray's testimony

about "the fullest type of administrative review." S.Rep.No. 507, 92d Cong., 1st Sess. 7–8 (1971), U.S.Code Cong. & Admin. News 1971, pp. 2283, 2290. It goes on to discuss Section 209 (renumbered from section 205 during the preparation of a clean bill), as follows:

> The principal enforcement tool to be used by the Government is likely to be an injunction sought by the Attorney General. Such an injunction may be brought under section 209 of the Economic Stabilization Act, as amended by this bill, upon the request of any person authorized to exercise authority under this Act to the Attorney General that a violation of some regulation or order has occurred, is occurring, or is about to occur. The court granting such an injunction may also grant a mandatory injunction ordering any person to comply with a regulation or order. In addition to injunctive relief, the court may also order restitution of moneys received in violation of any regulation or order. It was not certain that, in these circumstances, there was an inherent equitable power in the court to set things right and order restitution. Restitution has been granted in several cases successfully prosecuted by the Government in Phase I (*United States v. Lieb*, [333 F.Supp. 424], Civil Action No. SA 71 CA 267, D.C., W.D.Tex., Oct. 13, 1971). This provision makes clear that the court has power to grant restitution.

*Id.* at 9, U.S.Code Cong. & Admin.News 1971, p. 2291.

Congress debated the ESA amendments on November 24, 29, 30 and December 1, 1971. The court has examined this debate in some detail, and has located few references even tangentially relevant to the issues before this court. *See* 117 Cong.Rec. 43078–79, 43236–304, 43456–537, 43672–728. The pertinent references occurred primarily during the course of an attempt to amend Section 207 to allow third parties to challenge administrative rules. *Id.* at 43477–79. These comments do not support Exxon's position.

The Conference Reports on the proposed amendments set forth the final evolution of the Act. *See* H.R.Rep.No. 745, 92d Cong., 1st Sess. (1971); H.R.Rep.No. 753, 92d Cong., 1st Sess. (1971), U.S.Code Cong. & Admin.News 1971, p. 2283. At this stage the Act included a section on administrative procedure, including provisions for limited hearing rights (Section 207); the establishment of civil and criminal sanctions (Section 208); the section allowing the Attorney General to bring suit to obtain injunctive relief or restitution (Section 209); a section providing for private enforcement actions (Section 210); and a provision for exclusive federal jurisdiction to review agency regulations and orders (Section 211). These interrelated provisions make a neat legislative package in which Section 209 would be redundant if Congress limited it in the manner suggested by Exxon. Finally, not a single statement in the Conference Reports suggests the conclusion sought by Exxon.

II.B. *The Emergency Petroleum Allocation Act of 1973*

The enforcement provisions of Section 209 were made applicable to the DOE's predecessor agencies by Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1) (1976), which provides that:

> . . . sections 205 through 207 and sections 209 through 211 of the Economic Stabilization Act of 1970 (as in effect on November 27, 1973) shall apply to the regulation promulgated under 753(a) of this title, to any order under this chapter, and to any action taken by the President (or his delegate) under this chapter, as if such regulation had been promulgated, such order had been issued, or such action had been taken under the Economic Stabilization Act of 1970 . . . . .

■ The court has examined the legislative history of Section 5(a)(1), and concludes that Congress intended simply to carry over in full force all the enforcement authority of the Economic Stabilization Act, *as amended*, to any agency administering the EPAA. *See* S.Rep.No. 159, 93d Cong., 1st

Sess. (1973) (discussing largely superseded Senate version of bill); H.R.Rep.No. 531, 93d Cong., 1st Sess. (1973); H.R.Rep.No. 628, 93d Cong., 1st Sess. (1973) (Conference Report), U.S.Code Cong. & Admin.News 1973, p. 2582. The Conference Report merely stated that:

> Section 5(a) of the House amendment provided that the regulation under the House amendment would be enforced under sections 205 through 213 (other than 212(b)) of the Economic Stabilization Act of 1970 (as in effect on the date of enactment of the bill) except that the expiration of the Economic Stabilization Act would not affect any authority to amend and enforce the regulation or to issue and enforce any order under the House amendment.

*Id.* at 31 U.S.Code Cong. & Admin.News 1973, p. 2707. The court concludes that the authority to choose between dual enforcement mechanisms, vested in agencies by the Economic Stabilization Act, was carried forward without change or impediment through the 1973 EPAA.

### II.C. *Department of Energy Organization Act of 1977*

Exxon contends that any remaining doubts about the limitations placed on the Department of Energy's enforcement powers are conclusively dispelled by Congress's enactment in 1977 of Section 503 of the Department of Energy Organization Act, 42 U.S.C. § 7193 (U.S.C.A.Supp.1978). Section 503 sets forth the procedural steps to be followed by DOE in the administrative "remedial order" process. If the Secretary of Energy believes "that a person has violated any rule, regulation, or order . . . he may issue a remedial order to the person." 42 U.S.C. § 7193(a). The remedial order, if issued, must describe the alleged violation with particularity. *Id.* If a party wishes to contest the proceeding, he is entitled to a review of the order by the Federal Energy Regulatory Commission. This review includes certain procedural rights, including:

> upon request, afford an opportunity for a hearing, including, at a minimum, the submission of briefs, oral or documentary evidence, and oral arguments. To the extent that the Commission in its discretion determines that such is required for a full and true disclosure of the facts, the Commission shall afford the right of cross examination. The Commission shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's remedial order, or directing other appropriate relief, and such order shall, for the purpose of judicial review, constitute a final agency action . . . . .

42 U.S.C.A. § 7193(c) (Supp.1978).

The defendant maintains that the existence of this statutory scheme precludes direct resort to the courts by the DOE. According to Exxon, the

> absence of a provision in the DOE Act unambiguously authorizing the agency to bypass the administrative process and institute court enforcement actions should alone be sufficient to preclude such arbitrary action. (Mem. in Support of Motion to Dismiss, p. 14).

From its examination of the legislative history of the DOEOA, the court concludes that the many pronouncements about due process at the administrative level and "full review" by the courts took place in the context of efforts to remedy perceived abuses at the administrative level that had taken place under the EPAA. At no point did Congress explicitly indicate an intention to compel the DOE to resort first to its administrative remedies. In sum, the court has before it a statute, unambiguous on its face, which allows the Department of Energy to sue, and a number of statements which do not derogate from that grant of authority, but rather stress the importance of due process at the administrative level.

Several sections of the DOE Act guide the court in analyzing the effect of the Act on the dual enforcement powers held by DOE's predecessor, the FEA. Section 301(a), 42 U.S.C.A. § 7151(a) (Supp.1978), states that:

> Except as otherwise provided in this chapter, there are hereby transferred to, and vested in, the Secretary all of the

functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration.

Section 503(a), 42 U.S.C.A. § 7193(a) (Supp.1978), states:

> If upon investigation the Secretary or his authorized representative believes that a person has violated any regulation, rule, or order described in section 7191(a) of this title promulgated pursuant to the Emergency Petroleum Allocation Act of 1973, he may issue a remedial order to the person.

Section 708, 42 U.S.C.A. § 7298 (Supp. 1978) reads as follows:

> Except as provided in subchapter IV of this chapter, nothing contained in this chapter shall be construed to limit, curtail, abolish, or terminate any function of, or authority available to, the President which he had immediately before the effective date of this chapter; or to limit, curtail, abolish, or terminate his authority to delegate, redelegate, or terminate any delegation of functions.

The President delegated to the FEA the authority to administer the Emergency Petroleum Allocation Act of 1973 by using the provisions of the Economic Stabilization Act of 1970, as amended. (Executive Orders 11695, 11748, 11790). The net effect of the above provisions was to confer upon the DOE all powers exercised by its predecessors unless they were withdrawn by the DOE Act. Exxon contends that this was done by implication during the enactment of Section 503.

The present version of Section 503 did not appear in the original bill, so that the Senate report contains no discussion relevant to the dual enforcement issue. *See* S.Rep.No. 164, 95th Cong., 1st Sess. 1–46 (1977), U.S. Code Cong. & Admin.News 1977, p. 854. On May 18, 1977, during the initial Senate consideration of the bill, Senator Javits offered an amendment to the Act that would

> establish a statutory procedure for enforcement actions under the Emergency Petroleum Allocation Act. There is no statutory procedure now in existence other than the general guidance contained in the Economic Stabilization Act of 1970 which has been implemented by regulations.
>
> The procedure that has evolved at FEA is one well-suited for emergency needs and temporary authorities, but it falls short of the due process safeguards and separation of functions requirements included in all other permanent regulatory schemes. The amendment is procedural and does not modify any of the underlying provisions of the Emergency Petroleum Allocation Act. It will require that a hearing be held before the Energy Regulatory Board before a party is judged guilty of a violation of the act, thus bringing enforcement of EPAA into line with enforcement of the other regulatory statutes administered by the Department.

123 Cong.Rec. (Daily ed.) S. 7921.

Senator Javits subsequently stated:

> The amendment provides that where a specific remedial order is issued against an individual on grounds of violation of EPAA regulations by the Energy Secretary, upon the application of that particular person or firm, that particular remedial order, as it is called in the bill, shall be subject to review by the Board which is organized for this and other purposes under title IV of the act. The Board shall have the right to call witnesses, cross-examine, and so on; insofar as it is germane to the order, so that the order may be upon the facts contested.
>
> The difference between this and the right of judicial review, which is also contained in the bill as it relates to this issue, is that here, the individual or the corporation charged may have a factual hearing upon the evidence, with the right of cross-examination, et cetera, instead of depending upon the record, which the agency itself may make as the basis for the appeal, which can then be decided only on the substantial-evidence rule.
>
> We believe that, in view of the broad powers which are given to the Secretary and the permanent nature of this regulatory scheme, this particular protection is

a very useful one to incorporate in the act.

*Id.* at S. 7935. Senator Stone, a co-sponsor of the amendment, added this comment:

This amendment would establish statutory due process procedures by affording an alleged wrongdoer a hearing on the record. Under these procedures, a partly will now have an opportunity at an agency hearing to present its case to an independent board, to rebut evidence presented against it, to confront adverse witnesses and to develop a complete record for a fair and equitable judicial review of the final Department order. . . .

Under current FEA procedure, these safeguards have not been fully applied in the compliance and enforcement process. Congress never intended to allow FEA to depart from these requirements of fundamental administrative due process. With the transition from a short-term administrative agency to a permanent, cabinet-level Department of Energy which will be authorized to develop and administer a long-term comprehensive national energy program, the Department must accept the responsibility of insuring administrative due process rights by affording a full and complete hearing on the record in Department adjudicatory hearings. Congress must now pass this amendment to clearly reaffirm its desire for fundamental due process in the administrative arena.

*Id.* at S. 7937.

Senator Jackson, however, expressed concern that the impact of the amendment had not been fully considered. *Id.* at S. 7936. Senator Javits agreed with Senator Jackson and urged him to look into the matter very carefully. *Id.*[7]

The House considered its own version of the Act on June 2 and 3, 1977. Congressman Eckhardt offered an amendment to the House version of the bill, identical to the one accepted by the Senate. During the course of deliberating this amendment, the following comments were made:

Mr. ECKHARDT, Mr. Chairman, when the Congress passed the bill establishing the program that we are dealing with here, it adopted the procedural provisions of the Economic Stabilization Act, which had been adopted in 1970 and which was thought at that time to require rather preemptory procedures respecting agency action. Of course, a great deal of time has passed since then; yet *there is no procedure by which a person ordered to comply with a rule or regulation by a remedial order can get a hearing before the agency.* It cannot get a hearing now before the FEA and under this bill there is no procedure for a hearing before the Department.

What this would do is give a person against whom remedial order is issued a right to a hearing before the agency.

I think it merely affords minimal due process. It affords a little bit less opportunity for a full adjudicatory type hearing than is afforded by the Administrative Procedure Act; but it gives the right to a person to be confronted by the agency's evidence on the other side.

7. The defendant cites the following colloquy between Senators Jackson and McClure in support of its position that Congress intended to channel DOE enforcement actions through the agency before proceeding in court:

Mr. McCLURE. And the Senator hopes that would resolve it there and not have to go to court.

Mr. JAVITS. Exactly.

123 Cong.Rec. S. 7395. Immediately before this statement, however, the Senators had stated:

Mr. McClure.

. . . . .

Now, just to follow the question of the Senator from Illinois in regard to the effect it may have upon speeding up or slowing down the decisionmaking procedures, I understand the Administrative Procedures Act would require that any applicants have utilized this proceeding before they can go to court.

Mr. JAVITS. Exactly. So it is really my purpose also to get a hearing before an independent decisionmaker where both sides could be presented, not just the bureaucracy side.

*Id.* It seems that the Senators were merely discussing the familiar rule that parties called before an administrative agency must exhaust their administrative remedies before challenging the agency actions in court.

123 Cong.Rec. (Daily ed.) H.5372 (emphasis added).

Mr. BROWN. . . . It seems to me that it is very important to have a sound, prudent, regular administrative procedure. The gentleman's amendment ideally does that. One of the things we have been observing over the last few months is that small independent producers who are challenged by the FEA just simply have to abandon their cases and accept the FEA ruling because they do not have the wherewithal to fight the FEA's decision. This will help assure that they will have the same kinds of rights that bigger outfits with stronger resources have in trying to respond to the bureaucracy.

*Id.*

Mr. CONTE. . . . With the establishment of this Cabinet-level Department, we must assure the small business sector the rights we denied them when establishing the Federal Energy Administration, that being the basic procedural due process rights in agency adjudicatory proceedings. Without this safeguard, this proposed Department would be the only permanent Cabinet-level entity with the right to adjudicate the rights of regulated persons without adhering to the basic due process provisions. It is essential that there be a normalization of the administrative process, so that independent marketers receive the same even-handed treatment as regulated parties before other Cabinet-level Departments. This is a matter of policy and equity we should not ignore. Mr. Chairman, in our hastened efforts to deal with the energy situation and all of its ramifications, it was easy to unintentionally forget the small business, which as a whole, provided a substantial amount of our energy supplies and marketing needs. This unintentional act has been the past record of our energy-related agencies and is something we cannot allow to continue if we

are serious about addressing the energy issue. I urge my colleagues to vote in favor of this amendment.

*Id.* at 5372–73.

A review of these statements convinces the court that Congress was primarily concerned with improving the administrative process at the agency level. The comments focused on the shortcomings of the agencies administering the EPAA. The court finds nothing in this ambiguous legislative history to indicate that Congress intended to withdraw the dual enforcement powers that it had granted in the Economic Stabilization Act. It is apparent that in enacting Section 503 that Congress focused only on those matters that the DOE decided to process within the agency.[8]

In view of the strong policy considerations against a repeal by implication, *see Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the court concludes that Congress did not graft an administrative exhaustion requirement onto actions brought under the EPAA when it created the Department of Energy.

### III.

### THE ACCARDI DOCTRINE DOES NOT BAR THE AGENCY FROM PROCEEDING DIRECTLY TO COURT

The defendant also contends that the doctrine enunciated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), requires the dismissal of this action. In *Accardi*, the Supreme Court vacated a deportation order because the record indicated that Accardi had been prejudiced by being placed on the Attorney General's list of "unsavory characters" who should be deported. The Court reasoned that a Deportation Board was required by agency regulations to exercise its own judgment in ruling on a proposed deportation, but possibly had not exercised its own judgment because of the Attorney General's list. *Id* at 266–67, 74 S.Ct. 499.

---

8. The court sees nothing in the Conference Reports to disturb this conclusion. *See* S.Rep.No. 367, 95th Cong., 1st Sess. 85–86 (1977); H.R. Rep.No. 539, 95th Cong., 1st Sess. 85–86 (1977), U.S.Code Cong. & Admin.News 1977, p. 854.

The *Accardi* case proved to be the seminal case in a long series of decisions requiring agencies to adhere strictly to their own regulations. *E. g., United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). The defendant in the present case seeks to apply the *Accardi* doctrine to obtain the benefit of "all regulations which benefit a party, either by conferring a substantive right, exemption, or procedural safeguard." (Memorandum in Support of Motion to Dismiss, p. 18) Exxon's attack on the filing of this action is premised on a belief that the agency, by proceeding directly to court, deprived Exxon of the right to establish a date of significant alteration in producing patterns on a reasonable basis other than that specified in FEA's September 1, 1976 ruling. Exxon also argues that certain DOE regulations designed to develop a full administrative record in agency proceedings contain no explicit statement that DOE may proceed to court after initiating an administrative proceeding, so that DOE is barred from bringing this suit.

Exxon's reliance upon the *Accardi* doctrine is misplaced for several reasons. First, the numerous cases cited by Exxon deal with situations where the agency violated or attempted to bypass an explicit agency regulation. In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), for example, counsel for Nixon argued that the Watergate Special Prosecutor could not challenge a claim of executive privilege made by the President. The Court rejected this contention on the basis of a regulation promulgated by the Attorney General which gave the Special Prosecutor the explicit power to contest the invocation of executive privilege. *Id.* at 694-96, 94 S.Ct. 3090 (Attorney General could amend regulation, but could not disregard it). In *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), the dismissal of a Foreign Service Officer for disloyalty was invalidated because the recommendation for dismissal came from the Civil Service Commission Loyalty Review Board, in contravention of State Department regulations providing that the findings of the Deputy Under Secretary on Loyalty would be final. *Id.* at 388–89, 77 S.Ct. 1152 (Deputy had found Service loyal). In *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), the Secretary of the Interior was deemed bound by his decision to terminate an employee for alleged communist sympathies, even though the employee could have been terminated without cause. *Id.* at 539–40, 79 S.Ct. 968. *See also Igonia v. Califano*, 186 U.S.App.D.C. 161, 165–166, 568 F.2d 1383, 1387–88 (1977) (agency bound by regulation providing that "other evidence of probative value" would be considered in application for social security benefits; *Teleprompter Cable Communications Corp. v. FCC*, 184 U.S.App.D.C. 161, 565 F.2d 736 (1977) (revocation of authority to carry remote signals improper because agency had previously allowed cable station to so operate, without qualification, under grandfather provision in promulgated rule); *Mayor & City Council of Baltimore v. Mathews*, 562 F.2d 914 (4th Cir. 1977) (agency acted *ultra vires* in attempting to terminate federal funds without first attempting to secure voluntary compliance as required by statute and regulation).

Second, Exxon's argument with respect to Ruling 1977–2 seems to presume that the agency will attempt in the present judicial proceeding to prevent Exxon from establishing an alternate date when a "significant alteration in producing patterns" took place. As indicated in the first section of this Memorandum, the DOE attempted to deal with the need to establish accurate base production control levels ("BPCL's") in fields which had been unitized by providing for a measurement and definition of "significant alteration in producing patterns." In Ruling 1977–2 the agency determined that the definition of significant alteration in producing patterns would be used as a guideline for fields which were unitized prior to September 1, 1976, but that:

> FEA will, however, on a case-by-case basis, permit unit operators to justify the establishment of the date of significant alteration in producing patterns in such

units on reasonable bases other than those specified in the present definition. 42 Fed.Reg. 4409, 4415 (January 25, 1977). The "will . . . permit" language, according to Exxon, requires the court to dismiss this action, because Exxon has not been permitted to establish an alternative date before the agency.

The fatal flaw in this argument is in its assumption that Exxon will be barred or precluded from attempting to establish an alternate date in the proceedings before the court. Nothing in the record to date in this case indicates that the DOE will attempt to prevent the defendant from introducing evidence in support of such a date.[9] Indeed, it would appear that any attempt by the DOE to do so would be a violation of the *Accardi* doctrine. Nonetheless, Exxon argues that "this judicial action precludes any objective agency consideration of reasonably based alternative definitions of 'significant alteration in producing patterns' because the agency necessarily has assumed in this suit an adversarial and antagonistic posture." (Def.'s Memorandum in Support of Motion to Dismiss, p. 22) This merely means that this court, rather than an arm of the agency, will assume the task of making findings of fact and conclusions of law.[10] As the plaintiff notes, "DOE has simply caused a court proceeding to be instituted in which Exxon has the opportuni-ty to raise all available defenses and has the benefit of every procedural protection available in administrative proceedings." (Memorandum in Opposition to Defendant's Motion to Dismiss, p. 26).

Exxon also maintains that the DOE, by electing to initiate administrative proceedings with the issuance of an NOPV, forfeited its right to proceed to court. First, according to Exxon, neither Section 205.-191[11] nor 205.192[12] of 10 C.F.R. authorize a referral to the Department of Justice at the NOPV stage. The absence of such authorization means that the agency is bound by its decision to proceed administratively. Exxon buttresses this contention by reference to 10 C.F.R. § 205.190(a), which provides that

> Nothing in these regulations is intended to affect the authority of ERA enforcement officials in coordination with the Department of Justice to initiate appropriate civil or criminal enforcement actions in court *without first initiating* administrative proceedings pursuant to this subpart.

43 Fed.Reg. 1931 (January 13, 1978). Exxon also contends that the preamble to the most recent revision of the enforcement regulations sets up an alternative which DOE must choose. *See* 43 Fed.Reg. 1930–31 (January 13, 1978) (agency not barred "from initiating an appropriate civil or

---

**9.** Indeed, counsel for the DOE conceded at the hearing that the Government would not attempt to bar Exxon from establishing a reasonable alternative date in proceedings before this court. (Hearing Transcript, at 45–47).

**10.** At the hearing in this matter it became apparent that Exxon's primary fears are this court's lack of expertise in energy matters and the absence of a concrete standard for this court to apply if this case goes to trial. (Hearing Transcript, at 8–11) In recent years, Congress has seen fit to bestow upon the federal courts jurisdiction over numerous, complex areas of the law. The court recoils from ruling that this complexity bars the court from hearing a particular case. Exxon's position on the absence of a standard is also without merit. Ruling 1977–2 stated that alternative dates for "significant alterations in producing patterns" would be allowed if a company demonstrated *"reasonable bases"* for the alternative date. The court must therefore determine, after weighing the evidence, if Exxon has demonstrated a reasonable basis for an alternative date. This standard is necessarily flexible, but it is a standard.

**11.** 10 C.F.R. § 205.191, as amended in January, 1978, sets forth the procedures to be followed in issuing a notice of probable violation and in responding to one. 43 Fed.Reg. 1931–32 (January 13, 1978)

**12.** 10 C.F.R. § 205.192, as amended, sets forth the procedures for the second stage of the administrative proceedings, the "proposed remedial order." The agency "may" issue a proposed remedial order after issuing a NOPV, or even if it has not previously issued an NOPV. Subsection (d) provides that "[a] proposed remedial order may be referred at any time to the Department of Justice for appropriate action . . . ." 43 Fed.Reg. 1932 (January 13, 1978)

criminal enforcement action in court *rather than* utilizing the administrative procedures established in these regulations").

This semantical excursion ignores several unshakable facts. The agency promulgated in 1974 a regulation empowering it to bring an action "[w]henever it appears . . . that any person has engaged, is engaged, or is about to engage in any act or practice constituting a violation of any regulation or order issued under this chapter . . . " 10 C.F.R. § 205.204 (1978) This regulation parallels DOE's statutory authorization to sue, and it contains no reference to an election of remedies. Moreover, although Exxon has protested vigorously that "[t]his action eradicates both the additional rights conferred by the interim procedures and the rights existing under prior compliance measures," it does not point to a *single* procedural protection which it would have received in the administrative proceeding that it will not receive in this court.

After examining the numerous regulations cited by Exxon in support of its position, the court concludes that Exxon's contentions are without merit. None of the regulations states explicitly that the DOE must elect its remedy, and the court will not read such a requirement into the regulations on the basis of the arguments proffered by Exxon, which essentially present a fragmented analysis of the regulations, rather than an examination of the regulatory scheme as a whole.

Exxon's contention that the DOE is bound by its prior administrative practice is also without merit. Exxon has not indicated that it was prejudiced in any way by relying on the practice of DOE and its predecessors of conducting most compliance actions administratively. Moreover, the recent shift in enforcement strategy resulted from a barrage of criticism of the enforcement efforts of DOE's predecessors, and not from the whim or caprice of the agency. It is significant that one major source of criticism, the Final Report of the Task Force on Compliance and Enforcement (March, 1978 reprint) [hereinafter the "*Sporkin Report*"] attributed the reluc-

tance to proceed directly to court not to a lack of power to do so, but to the need to refer cases to the Department of Justice for prosecution:

The Agency has broad powers to remedy violative conduct in both the civil and administrative fora. Up until this time, however, the Agency has virtually abandoned its power to bring a civil injunctive action or seek restitution in the federal courts. Not doing so has impaired the effectiveness of the Agency's enforcement program. In large part, the FEA's reluctance to bring civil actions is due to the Agency's lack of authority to represent itself in Court. In addition, despite the enormity of the Agency's enforcement program, the Department of Justice only devotes approximately four man-years to the handling of FEA's civil actions.

An extremely important element in the effectiveness of other agencies with enforcement powers similar to those of the FEA has been their ability to represent themselves in federal courts—particularly in the context of seeking remedial judicial orders. Regulatory agencies created to develop a special expertise in complex or technical areas cannot be constantly required to rationalize or justify Agency policy to the Justice Department or to obtain its concurrence in pursuing actions with significant regulatory consequences. Not only can the practice be terribly demoralizing to the Agency, but it can also impede the implementation of critical Agency policy decisions.

*Sporkin Report* pp. xxvii-xxviii. *See also* III–25 (recommendation that special unit be established to investigate and prosecute complex cases); V–34–42 (overview of authority for enforcement actions); V–94–101 (authority to seek injunctive relief, restitution, and civil penalties); V–124–136 (review of numerous problems resulting from Justice Department representation).

## IV. CONCLUSION

The Department of Energy enforces a statute, the EPAA, which explicitly refers

to Section 209 of the Economic Stabilization Act, as amended. Section 209 states baldly, without qualification, that the agency may request the Attorney General to bring suit *whenever* it appears that a violation has occurred or is about to occur. This statutory muscle has not atrophied from lack of use. Nor can it be said, as long as Section 209 remains on the books, that the mere creation of detailed administrative procedures at the agency level eliminates the power to go to court. Finally, the federal courts provide the very separation of judicial and prosecutorial functions and the same procedural protections that Exxon laments losing. The court will, therefore, deny Exxon's motion to dismiss.